**BURSOR & FISHER, P.A.**
Kaili C. Lynn (State Bar No. 334933)
Joshua R. Wilner (State Bar No. 353949)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-mail: klynn@bursor.com
        jwilner@bursor.com

**BURSOR & FISHER, P.A.**
Philip L. Fraietta (State Bar No. 354768)
50 Main St., Ste. 475
White Plains, NY 10606
Telephone: (914) 874-0710
Facsimile: (914) 206-3656
E-mail: pfraietta@bursor.com

**BURSOR & FISHER, P.A.**
Max S. Roberts (State Bar No. 363482)
Victoria X. Zhou (*Pro Hac Vice*)
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (646) 837-7150
Facsimile:  (212) 989-9163
E-mail: mroberts@bursor.com
        vzhou@bursor.com

*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| THU NGUYEN, individually and on behalf of all other persons similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>MACY'S.COM, LLC.,<br><br>Defendant. | Case No. 5:25-cv-07096-PCP<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED**<br><br>Hon. P. Casey Pitts |

## TABLE OF CONTENTS

**PAGE**

NATURE OF THE ACTION ................................................................................. 1

THE PARTIES ....................................................................................................... 2

JURISDICTION AND VENUE ........................................................................... 2

FACTUAL ALLEGATIONS ................................................................................ 3

I.   THE CALIFORNIA INVASION OF PRIVACY ACT PROTECTS CALIFORNIANS' RIGHT TO CONTROL THE DISSEMINATION OF THEIR ELECTRONIC COMMUNICATIONS ................................................................. 3

II.  DEFENDANT VIOLATES THE CALIFORNIA INVASION OF PRIVACY ACT ........... 5

     A.   The Mechanics And Privacy Implications Of IP Addresses ..................... 6

          1.   Differentiating Between A Public Versus Private IP Address ...................... 6

          2.   The Privacy Implications Of Public IP Addresses ......................... 9

     B.   The Trackers Are "Pen Registers" That Defendant And The Third Parties Use To De-Anonymize And Identify Users And Sell Their Information To Advertisers ........................................................... 12

          1.   The ADNXS Tracker And The Data Broker And Data Seller Partners It Syncs With ........................................................... 13

               (i)    Criteo ........................................................................... 16

               (ii)   PubMatic ...................................................................... 19

               (iii)  UIDS Partner Data Brokers And Data Sellers ................ 23

          2.   The Taboola Tracker And The Data Broker And Data Seller Partners It Syncs With ........................................................... 25

               (i)    Yahoo ........................................................................... 28

III. DEFENDANT'S CONDUCT CONSTITUTES AN INVASION OF PLAINTIFF'S AND CLASS MEMBERS' PRIVACY ........................................................... 30

     A.   Data Brokers And Real-Time Bidding: The Information Economy ................ 31

          1.   Data Brokers ................................................................................ 31

          2.   Real-Time Bidding ...................................................................... 36

          3.   Cookie Syncing ........................................................................... 41

     B.   Defendant Uses The ADNXS Tracker For Targeted Advertising, Identity Resolution, And Data Monetization ........................................... 45

      C.     Defendant Uses the Taboola Tracker For Targeted Advertising Identity Resolution, And Data Monetization............................................................47

IV.     PLAINTIFF'S EXPERIENCE ..................................................................................49

V.     DEFENDANT IS SUBJECT TO JURISDICTION IN CALIFORNIA ..............................51

CLASS ALLEGATIONS...........................................................................................................52

CAUSES OF ACTION...............................................................................................................54

PRAYER FOR RELIEF .............................................................................................................56

JURY DEMAND.........................................................................................................................57

1
2
3
4

Plaintiff Thu Nguyen ("Plaintiff"), individually and on behalf of all others similarly situated, by and through his attorneys, makes the following allegations pursuant to the investigation of his counsel and based upon information and belief, except as to allegations specifically pertaining to himself and his counsel, which are based on personal knowledge.

5

## NATURE OF THE ACTION

6
7
8

1.      Defendant Macy's.com, LLC. ("Defendant" or "Macy's") owns and operates macys.com (the "Website"), which is a digital retail store for clothing, beauty products, and home goods.

9
10
11
12
13
14
15
16
17

2.      When users visit the Website, Defendant causes at least two Trackers—the ADNXS Tracker and the Taboola Tracker (collectively, the "Trackers")—to be installed on Website visitors' browsers.  The Trackers are operated by separate and distinct third parties: Microsoft and Taboola, respectively (together, the "Third Parties").  Through their respective Trackers, each of the Third Parties records and decodes Website users' internet protocol ("IP") addresses and other device identifier information such as device type, browser type, and unique and persistent identifiers (the "Device Metadata").  The Third Party Trackers also set a cookie that includes a unique user identifier, which the Trackers record on subsequent visits and which is used by the Third Parties to identify and de-anonymize the user.

18
19
20
21

3.      Defendant then uses the data collected by the Trackers, and in conjunction with the Third Parties operating them, for targeted marketing and advertising that enable Defendant to monetize its Website.  That is, Defendant and the Third Parties benefit from the Third Parties' unconsented-to collection of Plaintiff's and Class Members' personal information.

22
23
24

4.      Because the Trackers capture Website visitors' "routing, addressing, or signaling information," the Trackers constitute a "pen register" under Section 638.50(b) of the California Invasion of Privacy Act ("CIPA").

25
26

5.      By installing and using the Trackers without Plaintiff's prior consent and without a court order, Defendant violated CIPA § 638.51(a).

27
28

6.      The conduct alleged herein is made more invasive by the Third Parties, who do more than just operate the Trackers and collect Plaintiff's and Class Members' IP Addresses and Device Metadata.  Taboola is a data broker, and Microsoft, while not a registered data broker, links the information it collects about Website users with other data brokers whose trackers Defendant also installs on Website users' browsers.  In practice, the Third Parties add the IP addresses and Device Metadata of Website users to comprehensive user profiles and use that information to track Plaintiff and Class Members across the internet.  Those data profiles are then provided to advertisers for more targeted and tailored advertising based on a broad universe of information.  In particular, by installing and using the Third Parties' Trackers on its Website, Defendant is able to more effectively target users on other websites with advertisements—which in turn enriches Defendant—because users are linkable to their visits to Defendant's Website and made more valuable by being able to be linked to comprehensive profiles.

7.      Plaintiff brings this action to prevent Defendant from further violating the privacy rights of California residents, and to recover statutory damages for Defendant's violation of CIPA § 638.51.

**THE PARTIES**

8.      Plaintiff Thu Nguyen resides in San Jose, California and has an intent to remain there, and is therefore a citizen of California.  Plaintiff Nguyen was in California when he visited the Website.

9.      Defendant Macy's.com, LLC. is an Ohio corporation with its principal place of business in Springdale, Ohio.

**JURISDICTION AND VENUE**

10.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(a) because this case is a class action where the aggregate claims of all members of the proposed class are in excess of $5,000,000.00 exclusive of interest and costs, there are over 100 members of the putative class, and at least one class member is a citizen of a different state than Defendant.

11.    Defendant is an "unincorporated association" under CAFA and is therefore "a citizen of the State where it has its principal place of business [Ohio] and the State under whose laws it is organized [Ohio]." *See* 28 U.S.C. § 1332(d)(10).

12.    This Court has jurisdiction over Defendant for the reasons set forth below. *See* Factual Allegations § V, *infra*.

13.    Venue is proper pursuant to 28 U.S.C. § 1391(b) because a substantial portion of the events giving rise to this action occurred in this District.

## FACTUAL ALLEGATIONS

I.    **THE CALIFORNIA INVASION OF PRIVACY ACT PROTECTS CALIFORNIANS' RIGHT TO CONTROL THE DISSEMINATION OF THEIR ELECTRONIC COMMUNICATIONS**

14.    The California Legislature enacted CIPA to protect certain privacy rights of California citizens. The California Legislature expressly recognized that "the development of new devices and techniques for the purpose of eavesdropping upon private communications … has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society." Cal. Penal Code § 630.

15.    As the California Supreme Court has held in explaining the legislative purpose behind CIPA:

> While one who imparts private information risks the betrayal of his confidence by the other party, a substantial distinction has been recognized between the secondhand repetition of the contents of a conversation and its *simultaneous dissemination to an unannounced second auditor, whether that auditor be a person or mechanical device.*
>
> As one commentator has noted, such secret monitoring denies the speaker an important aspect of privacy of communication—*the right to control the nature and extent of the firsthand dissemination of his statements.*

*Ribas v. Clark*, 38 Cal. 3d 355, 360-61 (1985) (emphasis added; internal citations omitted).

16.    As relevant here, CIPA § 638.51(a) proscribes any "person" from "install[ing] or us[ing] a pen register or a trap and trace device without first obtaining a court order."

17.    A "pen register" is a "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or

electronic communication is transmitted, but not the contents of a communication." Cal. Penal Code § 638.50(b).

18.     A "trap and trace device" is a "a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication." Cal. Penal Code § 638.50(b).

19.     In plain English, a "pen register" is a "device or process" that records *outgoing* information, while a "trap and trace device" is a "device or process" that records *incoming* information.

20.     Historically, law enforcement used "pen registers" to record the numbers of outgoing calls from a particular telephone line, while law enforcement used "trap and trace devices" to record the numbers of incoming calls to that particular telephone line.   As technology has advanced, however, courts have expanded the application of these surveillance devices to the Internet.

21.     For example, if a user sends an email, a "pen register" might record the email address it was sent from because this is the user's *outgoing* information.   On the other hand, if that same user receives an email, a "trap and trace device" might record the email address it was sent from because this is *incoming* information that is being sent to that same user.

22.     Although CIPA was enacted before the dawn of the Internet, "the California Supreme Court regularly reads statutes to apply to new technologies where such a reading would not conflict with the statutory scheme." *In re Google Inc.* 2013 WL 5423918, at *21 (N.D. Cal. Sep. 26, 2013). For this reason, this Court and others have regularly applied the CIPA to Internet tracking technologies, including the exact trackers at issue here. *Wiley v. Universal Music Grp., Inc.*, 2025 WL 3654084, at *8 (N.D. Cal. Dec. 17, 2025) (Pitts, J.) ("Section 638.50's definition does not limit 'pen registers' to telephones, even though other sections of CIPA are expressly so limited."); *Fregosa v. Mashable, Inc.*, 2025 WL 2886399, at *1, *5-6 (N.D. Cal. Oct. 9, 2025) (finding ADNXS Tracker was a "pen register"); *see also, e.g.*, *Shah v. Fandom, Inc*, 754 F. Supp. 3d 924, 930 (N.D. Cal. 2024) (finding trackers similar to those at issue here were "pen registers" and noting "California courts do

not read California statutes as limiting themselves to the traditional technologies or models in place at the time the statutes were enacted"); *Mirmalek v. Los Angeles Times Communications LLC*, 2024 WL 5102709, at *3-4 (N.D. Cal. Dec. 12, 2024) (same); *Moody v. C2 Educ. Sys. Inc.* 742F. Supp. 3d 1072, 1076 (C.D. Cal. 2024) ("Plaintiff's allegations that the TikTok Software is embedded in the Website and collects information from visitors plausibly fall within the scope of §§ 638.50 and 638.51."); *Greenley v. Kochava, Inc*, 684 F. Supp. 3d 1024, 1050 (S.D. Cal. 2023) (referencing CIPA's "expansive language" when finding software was a "pen register").

23.   This accords with the fact that, "when faced with two possible interpretations of CIPA, the California Supreme Court has construed CIPA in accordance with the interpretation that provides the greatest privacy protection." *Matera v. Google Inc.*, 2016 WL 8200619, at *19 (N.D. Cal. Aug. 12, 2016).

24.   Individuals may bring an action against the violator of any provision of CIPA—including CIPA § 638.51—for $5,000 per violation.  Cal. Penal Code § 637.2(a)(1).

## II.   DEFENDANT VIOLATES THE CALIFORNIA INVASION OF PRIVACY ACT

25.   To make Defendant's Website load on a user's internet browser, the browser sends an "HTTP request" or "GET" request to Defendant's server where the relevant Website data is stored. In response to the request, Defendant's server sends an "HTTP response" back to the browser with a set of instructions.  A general diagram of this process is pictured at Figure 1, which explains how Defendant's Website transmits instructions back to users' browsers in response to HTTP requests.

**Figure 1:**



26.    The server's instructions include how to properly display the Website—*e.g.*, what images to load, what text should appear, or what music should play.

27.    In addition, the server's instructions cause the Trackers to be installed on a user's browser.  The Trackers then cause the browser to send identifying information—including the user's IP address and Device Metadata—to Microsoft and Taboola.  These Third Parties, through their Trackers, also set a cookie on Website users' browsers, which sends a unique identifier to these Third Parties that allows them to track users on the Website over multiple visits and across the Internet.  And the Third Parties sync their Trackers with those of data brokers to de-anonymize and identify users.

### A.    The Mechanics And Privacy Implications Of IP Addresses

28.    An IP address is a unique identifier for a device, which is expressed as four sets of numbers separated by periods (*e.g.*, 192.168.123.132).  The traditional format of IP addresses is called IPv4, and it has a finite amount of combinations and thus is limited to approximately 4.3 billion addresses.  Because this proved to be insufficient as the Internet grew, IPv6 was introduced.  IPv6 offers a vastly larger address space with 340 undecillion possible addresses.  While IPv6 adoption has been increasing, many networks still rely on IPv4.[1]

29.    Much like a telephone number, an IP address guides or routes an intentional communication signal (*i.e.*, a data packet) from one device to another.  An IP address is essential for identifying a device on the internet or within a local network, facilitating smooth communication between devices.

### 1.    Differentiating Between A Public Versus Private IP Address

30.    A public IP address is accessible from anywhere on the internet; it is assigned by an Internet Service Provider ("ISP") and it is unique globally.  Public IP addresses are required for devices that need direct internet access.

---

[1]  *See, e.g., What is the Internet Protocol*, CLOUDFLARE, https://www.cloudflare.com/learning/network-layer/internet-protocol/; Stefano Gridelli, *What is an RFC1918 Address?*, NETBEEZ (Jan. 22, 2020), https://netbeez.net/blog/rfc1918/.

1

2

3

31.     While public IP addresses are unique, they are not necessarily "public" in the sense that an individual is not actively sending data packets out, the public IP address remains private and is not broadcast to the wider internet.

4

5

6

7

8

32.     Public IP addresses can be used to determine the approximate physical location of a device.  For example, services like iplocation.io use databases that map IP addresses to geographic areas—often providing information about the country, city, approximate latitude and longitude coordinates, or even the internet service provider associated with the public IP.  This geolocation capability is leveraged by online advertising and user identification services.

9

10

11

12

13

14

33.     A private IP address is used within an internal network and is not routable on the public internet.  The Internet Assigned Numbers Authority ("IANA") reserves specific ranges of numbers to be exclusively used for private IP addresses (*e.g.*, 172.16.0.0 through 172.31.255.255).  Thus, private IP addresses can be used repeatedly across different networks because they are isolated from the global internet.  For example, a home network in New York and an office network in Tokyo can both use the same private IP address (*e.g.*, 192.168.1.1) for their routers without conflict.

15

16

17

18

19

34.     The distinction between a public and private IP address is fundamental to the architecture of modern networks.  Public IP addresses facilitate global communication, while private IP addresses conserve the finite amount of combinations to make an IP address through local network communication.   And crucially, a private IP address does not divulge a user's geolocation, whereas a public IP address does and is thus extensively used in advertising.

20

21

22

23

24

35.     An analogy is useful.  A public IP address is like the number for a landline telephone for a household.  A private IP address is like each handset that is connected to that landline number (*e.g.*, "Handset #1," "Handset #2").  A lot can be gleaned from knowing the phone number who is making the call, while knowing Handset #1 versus Handset #2 is making a call provides additional information.

25

26

27

36.     The same is true of IP addresses.  The public IP address divulges the approximate location of the user that is connecting to the Internet and the router directing those communications (presumably the user's house or workplace), and it is the means through which the user actually

28

communicates with the website and the Internet at large.   The private IP address then distinguishes between the devices accessing the same public IP address.[2]

**Figure 2:**



*Each device on a network has a private IP address, and the router has a public IP address to communicate with the rest of the internet.*

37.    Thus, the differences between public and private IP addresses are as follows:[3]

**Figure 3:**

| Category | Private IP address | Public IP address |
|---|---|---|
| Scope | The private IP address only has a local scope in your own network. | The public IP address's scope is global. |
| Communication | It is used so devices within a network can communicate with each other. | It allows access to the internet and is used for communication outside of your own network. |
| Uniqueness | It's an address from a smaller range that's used by other devices in other local networks. | It's a unique address that's not used by other devices on the internet. |
| Provider | The router assigns a private IP address to a specific device on the local network. | The internet service provider assigns the public IP address. |
| Range | Private IP address ranges:<br><br>10.0.0.0 – 10.255.255.255,<br><br>172.16.0.0 – 172.31.255.255,<br><br>192.168.0.0 – 192.168.255.255 | Any IP address that isn't within a private IP address range. |

---

[2] While the Trackers do not collect private IP addresses, as discussed below, the Trackers also collect Device Metadata, which distinguishes between devices accessing the same public IP address.   So, by installing the Trackers on Website users' browsers, Defendant allows third parties to collect information that is analogous to a telephone number (the public IP address) and the specific handset that is making the call (the Device Metadata).

[3] WHAT'S THE DIFFERENCE BETWEEN A PUBLIC AND PRIVATE IP ADDRESS?, AVIRA (Jan. 31, 2024), https://www.avira.com/en/blog/public-vs-private-ip-address.

38.    A public IP address is therefore "routing, addressing, or signaling information."

39.    A public IP address is "addressing" information because it determines the general geographic coordinates of the user who is accessing a website.

40.    A public IP address is "routing" or "signaling" information because it is sending or directing the user's communication from the router in their home or work to the website they are communicating with, and ensuring that "emails, websites, streaming content, and other data reaches you correctly."[4]

### 2.    The Privacy Implications Of Public IP Addresses

41.    Through a public IP address, a device's state, city, zip code, and approximate latitude and longitude can be determined.  Thus, knowing a user's public IP address—and therefore geographical location—"provide[s] a level of specificity previously unfound in marketing."[5]

42.    A public IP address allows advertisers to (i) "[t]arget [customers by] countries, cities, neighborhoods, and … postal code"[6] and (ii) "to target specific households, businesses[,] and even individuals with ads that are relevant to their interests."[7]

43.    Indeed, "IP targeting is one of the most targeted marketing techniques [companies] can employ to spread the word about [a] product or service"[8] because "[c]ompanies can use an IP address … to personally identify individuals."[9]

44.    In fact, a public IP address is a common identifier used for "geomarketing," which is "the practice of using location data to identify and serve marketing messages to a highly-targeted

---

[4]  Anthony Freda, *Private IP vs Public IP: What's the Difference?*, AVG (June 4, 2021), https://www.avg.com/en/signal/public-vs-private-ip-address.

[5]  *IP Targeting: Understanding This Essential Marketing Tool*, ACCUDATA (Nov. 20, 2023), https://web.archive.org/web/20231209011353/https://www.accudata.com/blog/ip-targeting/.

[6]  *Location-Based Targeting That Puts You in Control*, CHOOZLE, https://choozle.com/geotargeting-strategies/.

[7]  Herbert Williams, *The Benefits of IP Address Targeting for Local Businesses*, LINKEDIN (Nov. 29, 2023), https://tinyurl.com/c2ne77ua.

[8]  *IP Targeting: Understanding This Essential Marketing Tool*, ACCUDATA (Nov. 20, 2023), https://web.archive.org/web/20231209011353/https://www.accudata.com/blog/ip-targeting/.

[9]  Trey Titone, *The Future Of IP Address As An Advertising Identifier*, AD TECH EXPLAINED (May 16, 2022), https://adtechexplained.com/the-future-of-ip-address-as-an-advertising-identifier/.

audience. Essentially, geomarketing allows [websites] to better serve [their] audience by giving [them] an inside look into where they are, where they have been, and what kinds of products or services will appeal to their needs."[10] For example, for a job fair in specific city, companies can send advertisements to only those in the general location of the upcoming event.[11]

45.    "IP targeting is a highly effective digital advertising technique that allows you to deliver ads to specific physical addresses based on their internet protocol (IP) address. IP targeting technology works by matching physical addresses to IP addresses, allowing advertisers to serve ads to specific households or businesses based on their location."[12]

46.    "IP targeting capabilities are highly precise, with an accuracy rate of over 95%. This means that advertisers can deliver highly targeted ads to specific households or businesses, rather than relying on more general demographics or behavioral data."[13]

47.    In addition to "reach[ing] their target audience with greater precision," businesses are incentivized to use a customer's public IP address because it "can be more cost-effective than other forms of advertising."[14] "By targeting specific households or businesses, businesses can avoid wasting money on ads that are unlikely to be seen by their target audience."[15]

48.    In addition, "IP address targeting can help businesses to improve their overall marketing strategy."[16] "By analyzing data on which households or businesses are responding to their ads, businesses can refine their targeting strategy and improve their overall marketing efforts."[17]

49.    The collection of IP addresses here is particularly invasive here given that Taboola

---

[10] *See*, *e.g.*, *The Essential Guide to Geomarketing: Strategies, Tips & More*, DEEP SYNC (Nov. 20, 2023), https://web.archive.org/web/20240414041134/https://deepsync.com/geomarketing/.

[11] *See*, *e.g.*, *Personalize Your Website And Digital Marketing Using IP Address*, GEOFLI, https://tinyurl.com/3rn2reta.

[12] *IP Targeting*, SAVANT DSP, https://www.savantdsp.com/ip-targeting?gad_source=1&gclid=Cj0KCQjw1Yy5BhD-ARIsAI0RbXZJKJSqMI6p1xAxyqai1WhAiXRJTbX8qYhNuEvIfSCJ4jfOV5-5maUaAgtNEALw_wcB.

[13] *Id.*

[14] Williams, *supra*, https://tinyurl.com/c2ne77ua.

[15] *Id.*

[16] *Id.*

[17] *Id.*

and a number of the entities the Third Parties sync with and whose trackers Defendant also installs on Website users' browsers are data brokers.  As a report from NATO found:

> [a] data broker may receive information about a[] [website] user, including his … IP address.  The user then opens the [website] while his phone is connected to his home Wi-Fi network.  When this happens, the data broker can use the IP address of the home network to identify the user's home, and append this to the unique profile it is compiling about the user.  If the user has a computer connected to the same network, this computer will have the same IP address. The data broker can then use the IP address to connect the computer to the same user, and identify that user when their IP address makes requests on other publisher pages within their ad network.  Now the data broker knows that the same individual is using both the phone and the computer, which allows it to track behaviour across devices and target the user and their devices with ads on different networks.[18]

50.     Indeed, as McAfee (a data security company) notes, "data brokers can … even place trackers or cookies on your browsers … [that] track your IP address and browsing history, which third parties can exploit."[19]

51.     Further, as Yahoo (whose tracker Defendant installs and uses on Website users' browsers) admits, an IP address is an example of a "probabilistic ID" that is used "to identity the user, but can't reliably retain the privacy choices of users. While advertisers do get more scale with a probabilistic ID, *consumers lose control over their data*, which contradicts the industry's goal to protect consumer privacy better."[20]

52.     In other words, not only does the collection of IP addresses by the Third Parties cause harm in and of itself, data brokers like Taboola and a number of the entities the Third Parties sync with and whose trackers Defendant also installs on Website users' browsers can use IP addresses to identify users, append the IP address to a unique profile containing even more information about the user,  specifically attaches IP addresses to comprehensive user profiles, and track Plaintiff and Class

---

[18] HENRIK TWETMAN & GUNDARS BERGMANIS-KORATS, NATO STRATEGIC COMMUNICATIONS CENTRE OF EXCELLENCE, DATA BROKERS AND SECURITY at 11 (2020), https://stratcomcoe.org/cuploads/pfiles/data_brokers_and_security_20-01-2020.pdf.

[19] Jasdev Dhaliwal, *How Data Brokers Sell Your Identity*, MCAFEE (June 4, 2024), https://www.mcafee.com/blogs/tips-tricks/how-data-brokers-sell-your-identity/.

[20] Niki Zacharopoulou, *The Evolution of Identity – Part 1: Identity Solutions For Addressable: The Five Attributes You Should Care About*, YAHOO (Apr. 23, 2024), https://tinyurl.com/2ndxnke6.

Members across the Internet using their IP addresses and compiling vast reams of other personal information in the process.

53.     For these reasons, under Europe's General Data Protection Regulation, IP addresses are considered "personal data, as they can potentially be used to identify an individual."[21]

54.     Likewise, under the California Consumer Privacy Act, IP addresses are considered "personal information" because they are "reasonably capable of being associated with, or could reasonably be linked, directly or indirectly, with a particular consumer or household."  Cal. Civ. Code § 1798.140(v)(1)(A).[22]

**B.     The Trackers Are "Pen Registers" That Defendant And The Third Parties Use To De-Anonymize And Identify Users And Sell Their Information To Advertisers**

55.     When companies build their websites, they install or integrate various third-party scripts into the code of the website in order to collect data from users or perform other functions.[23]

56.     Often times, third-party scripts are installed on websites "for advertising purposes."[24]

57.     Further, "[i]f the same third-party tracker is present on many sites, it can build a more complete profile of the user over time."[25]

58.     Defendant has long incorporated the Trackers' code into the code of its Website, including when Plaintiff and Class Members visited the Website.  Thus, when Plaintiff visited the Website, the Website's code—as programmed by Defendant—caused the Trackers to be installed on Plaintiff's and other users' browsers.  This allows the Third Parties—through their respective

---

[21] IS AN IP ADDRESS PERSONAL DATA?, CONVESIO, https://convesio.com/knowledgebase/article/is-an-ip-address-personal-data/; *see also* WHAT IS PERSONAL DATA?, EUROPEAN COMMISSION, https://commission.europa.eu/law/law-topic/data-protection/reform/what-personal-data_en

[22] A "consumer" is defined as "a natural person who is a California resident."  Cal. Civ. Code § 1798.140(i).)  A "household" is defined as "a group … of consumers who cohabitate with one another at the same residential address and share use of common devices or services."  Cal. Civ. Code § 1798.140(1).)

[23] *See Third-party Tracking*, PIWIK, https://piwik.pro/glossary/third-party-tracking/ ("Third-party tracking refers to the practice by which a tracker, other than the website directly visited by the user, traces or assists in tracking the user's visit to the site. Third-party trackers are snippets of code that are present on multiple websites. They collect and send information about a user's browsing history to other companies…").

[24] *Id.*

[25] *Id.*

Trackers—to record and decode Plaintiff's and Class Members' IP addresses and Device Metadata, and pervasively track them across the Internet.

59.     The Trackers also causes additional data points to be sent from Plaintiff's and Class Members' browser to the Third Parties, which are meant to uniquely identify users across sessions and devices.  In addition to the public IP address, key elements include the user-agent string (browser, operating system, and device type) and device capabilities such as supported image formats and compression methods.  Persistent identifiers like the PUID, GUID, UID, PSVID, and User-Agent ensure users can be tracked even after clearing standard session data like cookies.  Advanced methods like fingerprinting and server-side matching remain unaffected by cookie deletion.  Combined, these elements form a detailed, unique fingerprint that allows for cross-site tracking and behavioral profiling.

60.     Defendant and the Third Parties then use the public IP addresses, Device Metadata, and other information of Website visitors that are collected and set by the Trackers, including those of Plaintiff and Class Members, to deanonymize Plaintiff and Class Members, serve hyper-targeted advertisements, and unjustly enrich themselves through this improperly collected information.

61.     At no time prior to the installation and use of the Trackers on Plaintiff's and Class Members's browsers, or prior to the use of the Trackers, did Defendant procure Plaintiff's and Class Members's consent for such conduct.  Nor did Defendant obtain a court order to install or use the Trackers.

       *1.     The ADNXS Tracker And The Data Broker And Data Seller*
              *Partners It Syncs With*

62.     Microsoft is a technology company with software-as-a-service products, such as Microsoft Advertising.  Microsoft owns and operates the ADNXS Tracker, which it provides to website owners like Defendant for a fee.  Microsoft rebranded ADNXS to "Microsoft Invest," but the two are the same service.

63.     According to Microsoft, the ADNXS Tracker is "a strategic buying platform built for the needs of today's advertisers looking to invest in upper-funnel buying and drive business

results."[26]

64.    The ADNXS Tracker is a "demand-side platform," which is explained in more detail below.  In short though, Microsoft facilities the selling of Defendant's Website users to interested advertisers, who will bid to show those users advertisements targeted to their identity through this Tracker.   To achieve this, Microsoft uses its Tracker to receive, store, and analyze information collected from website visitors, such as visitors of Defendant's Website.

65.    When a user visits Defendant's Website, the user's browser sends an HTTP request to Defendant's server, and Defendant's server sends an HTTP response with directions to install the ADNXS Tracker on the user's browser.  The ADNXS Tracker, in turn, instructs the user's browser to send Microsoft the user's IP address and Device Metadata—which Microsoft records and decodes as the below screenshot of traffic from Plaintiff's browser indicates (relevant portions highlighted in red boxes).[27]

**Figure 4:**



---

[26] *About Microsoft Invest*, MICROSOFT IGNITE (Feb. 12, 2024), https://learn.microsoft.com/en-us/xandr/invest/about-invest.

[27] All but the first two digits of Plaintiff's IP address have been redacted throughout this Complaint to protect his privacy.  Contrary to Defendant's assertions (ECF No. 24 at 4:11-12), Plaintiff's IP address here is the same as in the *Yahoo* matter.

66.    Moreover, Microsoft stores a cookie (the unique identifier, "UUID2" in Figure 4 above) with the user's IP address and Device Metadata in the user's browser cache.  The UUID2 "records information that helps differentiate between devices and browsers. This information is used to pick out ads delivered by the platform and assess the ad performance and its attribute payment."[28]

67.    When the user subsequently visits Defendant's Website, the ADNXS Tracker locates the UUID2 stored on the user's browser.  If the UUID2 is stored on the browser, the ADNXS Tracker causes the browser to send the UUID2 along with the user's IP address and Device Metadata to Microsoft.  A general diagram of this process is pictured as Figure 5, which explains how the Website causes the ADNXS Tracker to install a cookie on the user's browser and instructs the user's browser to send the user's IP address and Device Metadata along with the UUID2.

**Figure 5:**



68.    Using the IP addresses, Device Metadata, and UUID2 identifier, Microsoft can track and identify Website users across the Internet.

69.    If the user clears his or her cookies, then the user wipes out the ADNXS Tracker from its cache.  Accordingly, the next time the user visits Defendant's Website the process begins over again: (i) Defendant's server installs the ADNXS Tracker on the user's browser, (ii) the ADNXS Tracker instructs the browser to send Microsoft the user's IP address and Device Metadata, (iii) the ADNXS Tracker stores a UUID2 value in the browser cache, and (iv) Microsoft will continue to receive the user's IP address, Device Metadata on subsequent Website visits along with the UUID2.

---

[28] ATFX, COOKIE POLICY, https://www.atfxconnect.com/en/cookies-policy/.

70.     In all cases, however, Microsoft receives a user's IP address, Device Metadata, UUID2 every time its Tracker is loaded by the Website.

71.     In addition to the UUID2, the ADNXS Tracker also sets the "XANDR_PANID," which "registers data on the visitor" and "is used to optimize advertisement relevance."[29]

**Figure 6:**

XANDR_PANID=6sLwCp6oSspCP-8vuw5D59pgO6XYP0FoYSDHpOkq-KlL57FrMRViWMo9rLvi3V24SFJUxoQ-dckH1NzomL-kvk7JaBINH1_1fq0NvTNoyTE.

72.     The ADNXS Tracker will also share the user's UUID2 value with other third parties on the Website.  The explicit purpose of this process—which is called "cookie syncing" and is alleged in more detail below—is to identify the user by matching that user with any profiles Microsoft and/or these other third parties may have on the user, which are then provided by Microsoft to advertisers to effectuate targeted advertisements in the real-time bidding process.

                    **(i)     Criteo**

73.     As an example, Microsoft syncs its ADNXS Tracker with the Criteo tracker, which Defendant also installs on Website users' browsers.  As the below screenshot from Plaintiff's browser indicates, the value of the "appnxsid" parameter matches the value of the UUID2 parameter in Figure 4, meaning Microsoft is syncing its cookies with the Criteo tracker to obtain any information the Criteo tracker has about the user (and vice versa) and to facilitate the sale of users' information to advertisers.  Indeed, the "rtb" and "cookiematch" parameters leave little doubt that this is occurring.  In addition, the Criteo tracker is installing its own cookies (the unique identifier, "uid") on Plaintiff's browser for further tracking, syncing, and de-anonymization.

**Figure 7:**

```
    :authority  dis.criteo.com
       :method  GET
         :path  /dis/rtb/appnexus/cookiematch.aspx?appnxsid=7346896514001401670
        :scheme  https
         accept  image/avif,image/webp,image/apng,image/svg+xml,image/*,*/*;q=0.8
accept-encoding  gzip, deflate, br, zstd
accept-language  en-US,en;q=0.9
         cookie  uid=088813dc-38b0-4a57-919f-d9e303c0b4e4
```

---

[29] EY, COOKIE POLICY, https://www.ey.com/en_ce/legal-and-privacy/cookie-policy.

74.     The Criteo tracker is owned and operated by Criteo.  Although Criteo is not a registered data broker, it is still involved in the selling and sharing of user information to advertisers.

75.     Criteo is a supply-side platform that claims to "[m]aximize monetization" by being "the only SSP purpose-built for commerce" that provides "instant access to exclusive demand from 17,000+ brands, retailers, and agencies spending billions annually across Criteo's Commerce Media Platform."[30]

76.     Criteo instructs its partner websites like the Macy's Website to use "their valuable first-party data to increase yield and revenue."[31]  "First-party data refers to data a company collects directly from customers and audiences on its own channels," like the IP addresses and Device Metadata of Website users.[32]

77.     Indeed, Criteo specifically notes that websites like Defendant's can "[c]apture advertiser budgets and generate incremental revenue by opening on-site inventory to programmatic demand [also known as real-time bidding and described in more detail below]."[33]

78.     Criteo also provides its own identity graph, known as the "Shopper Graph," that provides "[r]eal-time identity data … ensur[ing] accurate cross-device identification from billions of active shoppers using multiple devices to shop."[34]  Specifically, Criteo's Shopper Graph pulls "data from over 720 million active daily shoppers" to "connect[] online and offline shopper identifiers across their screens for a holistic view of each individual's shopping intent."[35]

//

//

//

---

[30] *Commerce Grid*, CRITEO, https://www.criteo.com/platform/commerce-grid/.

[31] *Commerce Media Platform*, CRITEO, https://www.criteo.com/platform/commerce-media-platform/ (video at 0:37)

[32] Natalia Chronowska, *What is First-Party Data and Hose Does it Benefit Your Marketing*, PIWIK (Jan. 30, 2024), https://piwik.pro/blog/first-party-data-value/.

[33] SHOPPER GRAPH, CRITEO, https://www.criteo.com/technology/shopper-graph/.

[34] *Id.*

[35] *Id.*

**Figure 8:**



**Ensure accurate targeting with identity graph**

Criteo's continuously growing identity graph connects online and offline shopper identifiers across their screens for a holistic view of each individual's shopping intent.

This allows you to find and reach shoppers wherever they are researching products and services like yours —whether they are glancing at their social feed, scanning the morning news, comparing options on a marketplace or nearby your physical store.



**Acquire and retain your best customers**

With data from over 720 million active daily shoppers, reach your ideal audience for your objective, whether it's building awareness, driving traffic, or increasing conversions.

79.     Criteo markets its services specifically to retail brands like Defendant.  Indeed, Criteo tells clients like Defendant that they can "[e]arn new revenue by monetizing your audiences and digital channels.  Move beyond traditional merchandising to offer brands targeted ad placements that drive profitability, enhance shopper experiences, and grow long-term investment."[36]

80.     The upshot of all this is that Criteo enables website owners like Defendant to effectively sell their user inventory to advertisers in a de-anonymized, targeted format by syncing its tracker with the ADNXS Tracker.  This enables Defendant's users to be de-anonymized and identified by being matched to comprehensive profiles, and targeted with advertisements by Defendant and other retailers on other websites, thus driving advertising revenue for Defendant.

81.     Thus, when Criteo offers Website users up for sale to advertisers—as is Criteo's function as a supply-side platform—those users will receive higher bids because they can be better targeted by advertisers because of Criteo's synchronization with the ADNXS Tracker.  Microsoft, in turn, builds on its already expansive database by learning whatever Criteo knows about the user (and vice versa).  And Defendant is enriched by installing and using both trackers on its Website.

---

[36] RETAIL MEDIA, https://www.criteo.com/solutions/retail-media/.

(ii)    **PubMatic**

82.    As another example, Microsoft syncs its ADNXS Tracker with the PubMatic tracker, which Defendant also installs on Website users' browsers.  As the below screenshot from Plaintiff's browser indicates, the value of the "KRTBCOOKIE_57" parameter matches the value of the UUID2 parameter in Figure 4, meaning Microsoft is syncing its cookies with the PubMatic tracker to obtain any information the PubMatic tracker has about the user (and vice versa) and to facilitate the sale of users' information to advertisers.  Indeed, the KRTBCOOKIE is used "to correlate [PubMatic's] user IDs with those of our partners (such as demand side platform clients [*i.e.*, Microsoft] or other advertising technology companies).  We pass the information stored by the partner in this cookie to the partner when it is considering whether to purchase advertisements.  This enables the partner to make better decisions about whether to display an advertisement to you."[37] In addition, the PubMatic tracker is installing its own cookies (the unique identifier, "KADUSERCOOKIE") on Plaintiff's browser for further tracking, syncing, and de-anonymization. The KADUSERCOOKIE is specifically used to "uniquely identify each browser or device from which an individual user visits our partners' websites."[38]

**Figure 9:**

| | |
|---|---|
| KADUSERCOOKIE | B6474AD7-2C47-485C-9B9E-6F91852B2F44 |
| KRTBCOOKIE_218 | 22978-Zg4o8wADRdRLygAu&KRTB&23194-Zg4o8wADRdRLygAu&K |
| KRTBCOOKIE_10 | 22808-MiI1MDNhYjFiNzhiYzcxNDA5NDI0NTdiNTFiZmJjMjc&KRTB&2 |
| KRTBCOOKIE_57 | 22776-7346896514001401670&KRTB&23339-7346896514001401670 |
| KRTBCOOKIE_377 | 6810-d6e318d5-3bc9-43df-a887-513769d5e078&KRTB&22918-d6e3 |
| KRTBCOOKIE_632 | 23041-flY-Vau0jPr7S8kqGh5BDFP9yMmZvmztsYWg3ciYbG4&KRTB&2 |
| KRTBCOOKIE_107 | 1471-uid:pUZKrjLF1RSetU5&KRTB&23421-uid:pUZKrjLF1RSetU5 |
| KRTBCOOKIE_279 | 22890-4c532e47-65b9-489c-a2f2-205ae5b22bf9&KRTB&23011-4c53 |
| KRTBCOOKIE_1003 | 22761-b76da406-f239-11ee-82ca-d1b5cc095ff0&KRTB&23275-b76d |
| KRTBCOOKIE_594 | 17105-RX-7c6f2bec-bd97-4130-92ec-f1549c72c85d-005&KRTB&171 |
| KRTBCOOKIE_1278 | 23329-72bb448b-d165-4c8a-afa7-66d3e09b9ccf&KRTB&23340-72bl |

83.    Microsoft is also syncing its Tracker with each of the entities that PubMatic's tracker also syncs with via the other KRTBCOOKIE identifiers.

---

[37] PLATFORM COOKIE & OTHER SIMILAR TECHNOLOGIES POLICY, PUBMATIC, https://pubmatic.com/legal/platform-cookie-policy/.

84.     The PubMatic tracker is owned and operated by PubMatic, a registered data broker in California.[39]  Courts in this District have found that PubMatic's specific tracker is also a "pen register" under the CIPA.  *Deivaprakash v. Condé Nast Digital*, 798 F. Supp. 3d 1100, 1105-06 (N.D. Cal. 2025); *Fregosa*, 2025 WL 2886399, at *1, *5-6.

85.     PubMatic describes itself as a digital advertising platform that "exist[s] to enable content creators to run a more profitable advertising business, which in turn allows them to invest back into the multi-screen and multi-format content that consumers demand."[40]  Specifically, PubMatic is a "supply side platform" that helps website operators like Defendant "[m]aximize advertising revenue and control how your audiences are accessed."[41]

86.     To do this, PubMatic provides a "unique, supply path optimized and addressable brand demand—from the SSP of choice for the top advertisers and agencies in the world."[42]

**Figure 10:**



---

[38]  Platform Cookie & Other Similar Technologies Policy, https://pubmatic.com/legal/platform-cookie-policy/

[39]  Data Broker Registration for PubMatic, Inc., https://oag.ca.gov/data-broker/registration/186702.

[40]  *The Supply Chain Of The Future. Delivered*, PubMatic, https://pubmatic.com/about-us.

[41]  PubMatic SSP, https://pubmatic.com/products/pubmatic-ssp-for-publishers/.

[42]  *Id*.

87.     Likewise, PubMatic provides identity resolution via the "Identity Hub" service, "a leading ID management tool for publishers that leverages specialized technology infrastructure to simplify the complex alternative identifier marketplace."[43]  Notably, this allows website operators like Defendant to "drive monetization in cookie-restricted environments" by "[c]onnect[ing] seamlessly with buyers to drive programmatic revenue."[44]

88.     Notably, PubMatic also touts its ability to integrate with multiple other third parties— including "over 75 identity and data providers"—"leverage leading identifiers" to "help data owners [like Defendant] drive monetization and help media buyers [*i.e.*, advertisers] drive performance."[45] The extent of these capabilities is apparent from the number of KRTBCOOKIE identifiers that PubMatic sets on users' browsers, which each correspond to another ad-tech player:

**Figure 11:**



89.     PubMatic also helps companies like Defendant "[s]mash [their] campaign KPIs [key performance indicators]" and "reach [their] target audiences more effectively."[46]  One of the ways

[43] IDENTITY HUB, https://pubmatic.com/products/identity-hub/.

[44] *Id.*

[45] PUBMATIC SSP, https://pubmatic.com/products/pubmatic-ssp-for-buyers/.

[46] CONNECT WITH PUBMATIC'S AUCTION PACKAGES, https://pubmatic.com/auction-packages.

in which PubMatic accomplishes this is by selling "action packages," which are data sets—pulled together from different sources—to help advertisers target specific customers.[47]

90.    In other words, PubMatic utilizes third-party data, as well as data from the publisher like Defendant where the ad is ultimately placed (*i.e.*, first-party), to determine where to place advertisers' ads and who to place them in front of.

91.    By way of example, PubMatic sells a "Ramadan Auction Package" that targets consumers who observe Ramadan.[48]  This package helps companies target people who have indicated interest in Ramadan Events through consumer behavior, have internet search history such as "Prayer & Fasting," have location data that is "[f]requently seen at places of worship," or have "[d]emographic data" that shows they are married or live with people "who have shown interest towards Ramadan."[49]

**Figure 12:**



REACH PURPOSE-BUILT SEGMENTS DRIVEN BY DATA

**Consumption Behaviour**
Existing indicators of interest or consumed content in the following areas:
- Ramadan Events
- Home Decorators
- Recipes & Cooking
- Online Shopping

**Location Data**
Frequently seen at places of worship or popular food destinations.

**Families**
Demographic data on people who are married and/or with kids in the household and who have shown interest towards Ramadan.

**Search Intent**
Keywords around Ramadan, Prayer & Fasting, Food Recipes, Family, etc.

**Holiday Travel**
Online activity related to travel around Ramadan.

---

[47] *Id.*

[48] RAMADAN AUCTION PACKAGE, https://pubmatic.com/auction-packages/us/ramadan-us/.

[49] *Id.*

92.    The upshot of all this is that PubMatic enables website owners like Defendant to effectively sell their user inventory to advertisers in a de-anonymized, targeted format by syncing its tracker with the ADNXS Tracker.  This enables Defendant's users to be de-anonymized and identified by being matched to comprehensive profiles, and targeted with advertisements by Defendant and other retailers on other websites, thus driving advertising revenue for Defendant.

93.    Thus, when PubMatic offers Website users up for sale to advertisers—as is PubMatic's function as a supply-side platform—those users will receive higher bids because they can be better targeted by advertisers because of PubMatic's synchronization with the ADNXS Tracker.  Microsoft, in turn, builds on its already expansive database by learning whatever PubMatic knows about the user (and vice versa).  And Defendant is enriched by installing and using both trackers on its Website.

### (iii)    UIDS Partner Data Brokers And Data Sellers

94.    As a final example, as the below screenshot from Plaintiff's browser traffic indicates, the ADNXS Tracker sets another unique identifier when it is installed and used on users' browsers: the "UIDS."

**Figure 13:**



95.    The "UIDS" value is encoded in Base64, which can be easily decoded on publicly

available websites.[50]  Decoding the UIDS values above yields the other third parties that the ADNXS Tracker is syncing with—and who are syncing their own unique user IDs with the ADNXS Tracker—which are then permanently stored with the cookie on the users' browsers.  This allows Microsoft to identify the user based on other third-party identifiers—as well as for those third parties to associate the user in their own internal files—and this value is constantly updated as Microsoft syncs with further third parties.  For instance, the below screenshot shows the "UIDS" cookie includes identifiers for the registered data brokers like Magnite[51] (who owns and operates the Rubicon tracker) and Sharethrough.[52]  The ADNXS Tracker also syncs with TripleLift, which is an supply-side platform (described below) that also provides identity resolution services through its "TripleLift Audiences" feature[53]:

**Figure 14:**

eyJ0ZW1wVUIEcyI6eyJydWJpY29ujip7InVpZCI6IkxVS1EyQzZZLTE4LUxJR00ILCJleHBpcmVzIjoiMjAyNS0xMC0xM01QwNDoyNjo0M1oifSwidHJpcGxlbGlmdF9uYXRpdmUiOnsidWlkIjoiOnsidWlkIjoiMTE4Njg5Mzk0NDU3MDczNDIzMyIsImV4cGlyZXMiOiIyMDI1LTEwLTA0VDAzOjU2OjQzWiJ9

---

[50] *See, e.g.*, https://www.base64decode.org/.

[51] DATA BROKER REGISTRATION FOR MAGNITE INC., https://oag.ca.gov/data-broker/registration/568127.

[52] DATA BROKER REGISTRATION FOR SHARETHROUGH INC., https://oag.ca.gov/data-broker/registration/578001.

[53] PUBLISHERS, TRIPLELIFT, https://triplelift.com/publisher-solutions/.

*       *       *

96.    This is a non-exhaustive list of the entities with whom Microsoft syncs its Tracker. Suffice it to say, Microsoft is syncing its user cookies with numerous registered data brokers and data sellers to collect as much information about a user as possible and de-anonymize the user, all of which is used for advertising purposes.

97.    The ADNXS Tracker is at least a "process" because it is "software that identifies consumers, gathers data, and correlates that data." *Greenley*, 684 F. Supp. 3d at 1050.

98.    Further, the ADNXS Tracker is a "device" because "in order for software to work, it must be run on some kind of computing device." *See*, *e.g.*, *James v. Walt Disney Co.*, 701 F. Supp. 3d 942, 958 (N.D. Cal. 2023).

99.    Because the ADNXS Tracker captures the outgoing information—the IP address, Device Metadata, and unique user IDs—from visitors to the Website, it is a "pen register" for the purposes of CIPA § 638.50(b).

100.    The ADNXS Tracker is also a "pen register" because the information it records is being used to ascertain the identity of visitors to Defendant's Website, and is thus recording "addressing" information. *Greenley*, 684 F. Supp. 3d at 1050 ("software that identifies consumers" is a pen register).

### 2.    *The Taboola Tracker And The Data Broker And Data Seller Partners It Syncs With*

101.    Taboola is a software-as-a-service company that develops and operates the Taboola Pixel, which it provides to website owners, like Defendant, for a fee. Taboola is a registered data broker in California[54] and "an ad exchange that integrates with a range of industry-leading DSPs and SSPs."[55]

102.    Taboola uses "digital identifiers such as cookie IDs, IP addresses, and mobile advertising IDs from the consumer's device" to "provide[] consumers with personalized content and

---

[54] *Data Broker Registration for Taboola, Inc.*, https://oag.ca.gov/data-broker/registration/186589.

[55] Amanda Walgrove, *Supply Side Platforms (SSPs): What Are They, How Do They Work, Types*, Taboola (Mar. 14, 2022), https://tinyurl.com/438cnz9d.

advertisements across thousands of global digital properties."[56]

103.    Specifically, Taboola facilitates the advertising process by "gather[ing] [first party] data to help [its customers like Defendant] understand the actions users take on [their] website, like page visits, account creation, purchases, and video views."[57]  Customers like Defendant install the Tracker and then define "conversions" they want to track.[58]

104.    Taboola then takes this first party data and uses it to match a company's audience against Taboola's comprehensive user profiles. Next, Taboola takes its customers' first-party data and combines it with the profile data it already has, making that information more valuable to advertisers, thereby driving Defendant's revenue.

105.    As described above, a user visits Defendant's Website, the user's browser sends an HTTP request to Defendant's server, and Defendant's server sends an HTTP response with directions to install the Taboola Tracker on the user's browser.  The Taboola Tracker, in turn, instructs the user's browser to send Taboola the user's IP address and Device Metadata—which Taboola records and decodes—as indicated in the below screenshot of Plaintiff's browser traffic on the Website (relevant portions highlighted in red boxes).

**Figure 15:**



---

[56] *Id.*

[57] *Setup Unified Ecommerce Pixel*, CONNEXITY: A TABOOLA COMPANY, https://resources.connexity.com/hc/en-us/articles/12776493024029-Setup-Unified-Ecommerce-Pixel.

[58] *Id.*

106.    Moreover, Taboola stores unique user identifiers in the user's browser cache (the unique identifiers, "t_gid" and "t_pid," in Figure 15).  The t_gid "[a]ssigns a unique, User ID that Taboola uses for attribution and reporting purposes, and to tailor recommendations to this specific user based on interactions with an advertiser or publisher."[59]  The t_pid "[a]ssigns a unique, partitioned User ID that Taboola uses for attribution and reporting purposes, and to tailor recommendations to this specific user based on interactions with an advertiser or publisher."[60]

107.    When the user subsequently visits Defendant's Website, the Taboola Tracker locates these unique identifiers stored on the user's browser.  If these unique identifiers are stored on the browser, the Taboola Tracker causes the browser to send the unique identifiers along with the user's IP address and Device Metadata to Taboola.

108.    If the user clears his or her cookies, then the user wipes out the Taboola Tracker from its cache.  Accordingly, the next time the user visits Defendant's Website, the process begins over again: (i) Defendant installs the Taboola Tracker on the user's browser, (ii) the Taboola Tracker instructs the browser to send Taboola the user's IP address and Device Metadata, (iii) the Taboola Tracker stores unique user identifiers in the browser cache, and (iv) Taboola will continue to receive the user's IP address and Device Metadata on subsequent visits to the Website along with the unique user identifiers.

109.    In all cases, however, Taboola receives a user's IP address, Device Metadata, and unique user ID every time its Tracker is loaded by the Website.  Using the IP addresses, Device Metadata, and unique user IDs, Taboola can track and identify Website users across the Internet.

110.    As Taboola notes, its pixel "gathers data about users behavior and actions on your website, like page visits, account creation, purchases, [and] time per session."[61] This allows Taboola and its partners to "optimize [] marketing campaigns for optimal performance."[62]

---

[59] TABOOLA, *COOKIE POLICY*, https://www.taboola.com/policies/cookie-policy.

[60] *Id.*

[61] *Taboola Pixel Overview*, TABOOLA, INC., https://www.taboola.com/help/en/articles/6248618-taboola-pixel-overview

[62] *Id.*

111.    The explicit purpose of this process—which is called "cookie syncing" and is described in more detail below—is to identify the user by matching that user with any profiles Taboola and/or these other third parties may have on the user, which are then provided by Taboola for sale to advertisers.

(i)    <u>Yahoo</u>

112.    As an example, Taboola syncs its "t_gid" identifier with Yahoo's tracker, which Defendant also installs and uses on Website users' browsers.  As the below screenshot from Plaintiff's browser indicates, the value of the "tbla_id" parameter matches the value of the "t_gid" parameter in Figure 15.  This allows Taboola to obtain whatever information Yahoo has on the user (and vice versa).  Finally, Yahoo is installing its own cookies on Plaintiff's browser (the unique identifiers, "axids," "A3," "CMP," and "IDSYNC" in Figure 17) for further tracking, syncing, and de-anonymization.

**Figure 16:**



**Figure 17:**



| Name | Value |
|---|---|
| tbla_id | 624bdf44-0746-436c-b521-c2c73151b20f-tuctd07ae92 |
| axids | gam=y-ZoB3YLVE2ulwAl3AjhbK4ulh0H56SHD6~A&dv360=eS1BMFU0NWI4RTJ1RndCNmNZcENwSkZmNGpTYmNhWGxyZdH5B&ydsp=y-zjNkBuJl |
| A3 | d=AQABBPMoDmYCELbWvSt9H6siEIODEmN9dk0FEgEBCAH0VmiBaNwr0iMA_eMDAAcI8ygOZmN9dk0&S=AQAAAiBTnIIDsmG36yY5f4o96wc |
| cmp | t=1750446175&j=0&u=1YNN |
| IDSYNC | ~173h~2pfu:175s~2qbf:176k~2q7s:1776~2qb2:17mv~2p2k:18y3~2pxw:18yi~2p25:18yo~2p25:18z8~2pv7:18za~2pa1:190u~2q7q:1929~2q7q:193k |

113.    Although Yahoo is not a registered data broker, it is still involved in the selling and sharing of user information to advertisers.  Indeed, a large portion of Yahoo's business comes from marketing, especially gathering data from internet users to sell advertising services.

114.    As Yahoo explains:

> Yahoo Identity Solutions takes an integrated, omnichannel approach to the identity-constrained world and consists of two components:

Yahoo ConnectID for addressable environments and Next-Gen Solutions for non-addressable. Yahoo ConnectID is a first-party data-powered identity solution, fueled by direct consumer relationships with *more than 205 million authenticated users in the U.S.* It stands as one of the world's most popular cookieless identifiers, currently implemented across nearly 50,000 publisher domains and interoperable with more than 30 top data platforms, including LiveRamp, Epsilon, Adobe, Acxiom, and Twilio Segment.[63]

115.    What is clear is that the purpose of Yahoo's Identity Solutions is to identify users. Notably, the Next-Gen Solutions is for non-addressable environments "create[ing] inferences for targeting, optimization and measurement to ensure campaign effectiveness when user identity isn't available."[64]    As such, Yahoo collects information on Internet users' activity on a wide variety of websites and exchanges with numerous data brokers to do so.

116.    Yahoo also operates as a "demand-side platform" (DSP), explained in more detail below.  This means that Yahoo services use their tracking and data on hundreds of millions of users to help advertisers "target by behavior, interests, life stage, search, and many other categories."[65] Yahoo further boasts that its ad-targeting services are based on 4 trillion monthly data points.[66]

117.    Thus, Yahoo is de-anonymizing Plaintiff and web users by syncing unique identifiers to Yahoo's repository of information, and then providing that information to Taboola. Through this process, Taboola learns everything Yahoo knows about the user (and vice versa), and Yahoo is enriching the value of the information Taboola sells to advertisers.  This causes advertisers to place higher bids to show advertisements to Website users, thus enriching Defendant at the expense of Website users' privacy.

*        *        *

118.    This is a non-exhaustive list of the entities with whom Taboola syncs its Tracker. Suffice it to say, Taboola is syncing its user cookies with data sellers to collect as much information

---

[63] YAHOO, YAHOO BRINGS IDENTITY SOLUTIONS TO CTV, BRIDGING THE GAP ACROSS CHANNELS AND ENHANCING PERFORMANCE (April 16, 2024), https://www.yahooinc.com/press/yahoo-brings-identity-solutions-to-ctv-bridging-the-gap-across-channels-and-enhancing-performance.

[64] *Id.*

[65] Yahoo, *Yahoo DSP Platform*, https://www.yahooinc.com/yahoo-dsp/platform#Target.

[66] *Id.*

about a user as possible and de-anonymize the user, all of which is used for advertising purposes.

119.    The Taboola Tracker is at least a "process" because it is "software that identifies consumers, gathers data, and correlates that data." *Greenley*, 684 F. Supp. 3d at 1050.

120.    Further, the Taboola Tracker is a "device" because "in order for software to work, it must be run on some kind of computing device." *See*, *e.g.*, *James*, 701 F. Supp. 3d at 958.

121.    Because the Taboola Tracker captures outgoing "routing, addressing, and signaling" information—the IP address, Device Metadata, and unique user IDs—from visitors to the Website, it is a "pen register" for the purposes of CIPA § 638.50(b).

122.    The Taboola Tracker is also a "pen register" because the information it records is being used to ascertain the identity of visitors to Defendant's Website, and is thus recording "addressing" information. *Greenley*, 684 F. Supp. 3d at 1050 ("software that identifies consumers" is a pen register).

## III.    DEFENDANT'S CONDUCT CONSTITUTES AN INVASION OF PLAINTIFF'S AND CLASS MEMBERS' PRIVACY

123.    The collection of Plaintiff's and Class Members' personally identifying, de-anonymized information through Defendant's installation and use of the Trackers constitutes an invasion of privacy.

124.    As alleged herein, the Trackers are designed to conduct targeted advertising and boost Defendant's revenue, all through their surreptitious collection of Plaintiff's and Class Members' personal information.

125.    To put the invasiveness of Defendant's violations of the CIPA into perspective, it is also important to understand three concepts: data brokers, real-time bidding, and cookie syncing.

126.    In short, the import of these concepts is that: (i) the Third Parties are data brokers (or partner with data brokers) that collect user information from Website visitors to uniquely identify and de-anonymize users by using their IP addresses, Device Metadata, and unique user ID values to match users up to whatever information those Third Parties have on a user; (ii) the Third Parties share that information with other entities to create the most complete user profile they can (through cookie syncing), which includes a more complete and non-anonymous portrait of the user; and

(iii) those profiles are offered up for sale through the real-time bidding process to the benefit of Defendant, the Third Parties, and any entities the Third Parties sync with, and to the detriment of users' privacy interests.

### A.    Data Brokers And Real-Time Bidding: The Information Economy
#### 1.    Data Brokers

127.    While "[t]here is no single, agreed-upon definition of data brokers in United States law,"[67] California law defines a "data broker" as "a business that knowingly collects and sells to third parties the personal information of a consumer with whom the business does not have a direct [*i.e.*, consumer-facing] relationship," subject to certain exceptions.  Cal. Civ. Code § 1798.99.80(c).

128.    Any entity that qualifies as a "data broker" under California law must specifically register as such Cal. Civ. Code § 1798.99.82(a), which Taboola and a number of the entities the Third Parties sync with do.

129.    Some data brokers prefer to characterize themselves as "identity graph providers," but this is a distinction without a difference.  "An identity graph provides a single unified view of customers and prospects based on their interactions with a product or website across a set of devices and identifiers.  An identity graph is used for real-time personalization and advertising targeting for millions of users."[68]  This is exactly what data brokers do, and indeed, the entities that provide identity graphs are by and large required to register as data brokers under California law.  An "identity graph provider" is therefore just a euphemism for "data broker."

130.    "Data brokers typically offer pre-packaged databases of information to potential buyers," either through the "outright s[ale of] data on individuals" or by "licens[ing] and otherwise shar[ing] the data with third parties."[69]  Such databases are extensive, and can "not only include information publicly available [such as] from Facebook but also the user's exact residential address,

---

[67] JUSTIN SHERMAN, DUKE SANFORD CYBER POLICY PROGRAM, DATA BROKERS AND SENSITIVE DATA ON U.S. INDIVIDUALS: THREATS TO AMERICAN CIVIL RIGHTS, NATIONAL SECURITY, AND DEMOCRACY, at 2 (DUKE SANFORD CYBER POLICY PROGRAM, 2021), https://tinyurl.com/2esjkrtx.

[68] IDENTITY GRAPHS ON AWS, https://aws.amazon.com/neptune/identity-graphs-on-aws/.

[69] SHERMAN, *supra*, at 2.

date and year of birth, and political affiliation," in addition to "inferences [that] can be made from the combined data."[70]

131.    For instance, the NATO report noted that data brokers collect two sets of information: "observed and inferred (or modelled)." The former "is data that has been collected and is actual," such as websites visited." Inferred data "is gleaned from observed data by modelling or profiling," meaning what users may be *expected* to do. On top of this, "[b]rokers typically collect not only what they immediately need or can use, but hoover up as much information as possible to compile comprehensive data sets that might have some future use."[71]

132.    Likewise, a report by the Duke Sanford Cyber Policy Program "examine[d] 10 major data brokers and the highly sensitive data they hold on U.S. individuals."[72] The report found that "data brokers are openly and explicitly advertising data for sale on U.S. individuals' sensitive demographic information, on U.S. individuals' political preferences and beliefs, on U.S. individuals' whereabouts and even real-time GPS locations, on current and former U.S. military personnel, and on current U.S. government employees."[73]

133.    This data collection has grave implications for Americans' right to privacy. For instance, "U.S. federal agencies from the Federal Bureau of Investigation [] to U.S. Immigration and Customs Enforcement [] purchase data from data brokers—without warrants, public disclosures, or robust oversight—to carry out everything from criminal investigations to deportations."[74]

134.    As another example:

> Data brokers also hold highly sensitive data on U.S. individuals such as race, ethnicity, gender, sexual orientation, immigration status, income level, and political preferences and beliefs (like support for the NAACP or National LGBTQ Task Force) that can be used to directly undermine individuals' civil rights. Even if data brokers do

[70] Tehila Minkus et al., *The City Privacy Attack: Combining Social Media and Public Records for Detailed Profiles of Adults and Children*, COSN '15: PROCEEDINGS OF THE 2015 ACM ON CONFERENCE ON ONLINE SOCIAL NETWORKS 71, 71 (2015), https://dl.acm.org/doi/pdf/10.1145/2817946.2817957.

[71] TWETMAN & BERGMANIS-KORATS, *supra*, at 11.

[72] SHERMAN, *supra*, at 1.

[73] *Id.*

[74] *Id.* at 9.

1

not explicitly advertise these types of data (though in many cases

2

they do), everything from media reporting to testimony by a Federal Trade Commission commissioner has identified the risk that data brokers use their data sets to make "predictions" or "inferences" about this kind of sensitive information (race, gender, sexual orientation, etc.) on individuals.

3

4

This data can be used by commercial entities within the U.S. to discriminately target goods and services, akin to how Facebook advertising tools allow advertisers to exclude certain groups, such as those who are identified as people with disabilities or those who are identified as Black or Latino, from seeing advertisements. 59 Many industries from health insurance to life insurance to banking to e-commerce purchase data from data brokers to run advertisements and target their services.

5

6

7

8

9

…

10

Given identified discrimination problems in machine learning algorithms, there is great risk of these predictive tools only further driving up costs of goods and services (from insurance to housing) for minority groups.[75]

11

12

135.    Similarly, as the report from NATO noted, corporate data brokers cause numerous

13

privacy harms, including but not limited to depriving users of the right to control who does and does

14

not acquire their personal information, unwanted advertisements that can even go as far as

15

manipulating viewpoints, and spam and phishing attacks.[76]

16

//

17

//

18

//

19

//

20

//

21

//

22

//

23

//

24

//

25

//

26

27

[75] *Id.*

[76] TWETMAN & BERGMANIS-KORATS, *supra*, at 8.

28

**Figure 18:**



136.    In the modern age, these threats are far too real. For instance, the gunman who assassinated a Minnesota state representative and her husband "may have gotten their addresses or other personal details from online data broker services, according to court documents."[77]

137.    Similarly, following the protests in Los Angeles in summer 2025:

> Tech-skeptical California lawmakers and activists fear the Trump administration will leverage tech tools to track and punish demonstrators accused of interfering with Immigration and Customs Enforcement raids. One possible instrument at ICE's disposal: location data, a highly detailed record of people's daily movements

---

[77] Lily Hay Newman, *Minnesota Shooting Suspect Allegedly Used Data Broker Sites to Find Targets' Addresses*, WIRED (June 16, 2025), https://www.wired.com/story/minnesota-lawmaker-shootings-people-search-data-brokers/.

that's collected and sold by everything from weather apps to data brokers.[78]

138.    Of course, data brokers do not just track people for no reason; they do so because they have their trackers installed on users' browsers and are paid by website operators to do so.  So, by installing the trackers of data brokers on users' browsers, Defendant is causing and putting its users in the crosshairs of the privacy harms noted above.

139.    In addition, as noted above, data brokers like Taboola and the other data brokers the Third Parties sync with and whose trackers Defendant installs and uses on Website users' browsers, are able to compile such wide swaths of information in part by collecting users' IP addresses and Device Metadata, which is used by data brokers, like Taboola and the other data brokers the Third Parties sync with to track users across the Internet.[79]

140.    These data brokers will then:

> take that data and pair it with other data they've collected about you, pool it together with other data they've got on you, and then share all of it with businesses who want to market to you.  They can eventually build large datasets about you with things like: "browsed gym shorts, vegan, living in Los Angeles, income between $65k-90k, traveler, and single."  Then, they sort you into groups of other people like you, so they can sell those lists of like-people and generate their income.[80]

141.    This is a concept courts have faced before.  For instance, as a court in this District recently noted regarding an "identity resolution product," such a product:

> identifies consumers, addresses, or households across multiple media by linking together separate datasets relating to individual customers. For example, the product might correlate an email address submitted online with publicly available property information associated with the same email address.  This type of product enables clients to execute targeted marketing campaigns across different types of media.

*Adstra, LLC v. Kinesso, LLC*, 2025 WL 552050, at *2 (S.D.N.Y. Feb. 19, 2025); *see also* Marc Chase McAllister, *Modernizing the Video Privacy Protection Act*, 25 GEO. MASON L. REV. 102, 135 (2017)

---

[78] Tyler Katzenberger, *LA Protests Fuel California Drive To Hide Data From Trump*, POLITICO (June 11, 2025), https://www.politico.com/news/2025/06/11/la-protests-california-hide-data-from-trump-00400127

[79] *Id.* at 11.

[80] Paul Jarvis, *The Problem with Data Brokers: Targeted Ads and Your Privacy*, FATHOM ANALYTICS (May 10, 2022), https://usefathom.com/blog/data-brokers.

("Connecting individuals to devices can, in fact, be accomplished quite easily.").

142.    In short, by collecting IP addresses and Device Metadata, data brokers, like Taboola and the other data brokers the Third Parties sync with track users across the Internet, compiling various bits of information about users, building and matching users up to comprehensive user profiles using these identifiers that include an assortment of information, interests, and inferences, and offering up that information for sale to the highest bidder.  The "highest bidder" is a literal term, as explained below.

143.    As a result of Defendant's installation of the trackers of these data brokers, the information of Plaintiff and Class Members is linked to any profiles these data brokers may have about them using their IP addresses and Device Metadata (or new profiles are created for Plaintiff and Class Members).

144.    These profiles are then served up to any companies that want to advertise to these users on a variety of websites, including Defendant itself.  And these users become more identifiable, more valuable, and more easily targetable by Defendant and others because their IP addresses, Device Metadata, and unique user identifiers enable Defendant's users to be matched up to these data broker profiles.  Thus, Defendant is unjustly enriched through advertising revenue by installing the Trackers on Plaintiff's and Class Members' browsers, and thus, enabling the Third Parties to collect Plaintiff's and Class Members' IP addresses, Device Metadata, and unique user identifiers without consent.

### 2.    *Real-Time Bidding*

145.    Once data brokers like Taboola and many of the entities the Third Parties sync with collect Website users' IP addresses, Device Metadata, and unique user identifiers, how do they "sell" or otherwise help Defendant monetize that information?  This is where real-time bidding comes in.

146.    "Real Time Bidding (RTB) is an online advertising auction that uses sensitive personal information to facilitate the process to determine which digital ad will be displayed to a user on a given website or application."[81]

---

[81] Sara Geoghegan, *What is Real Time Bidding?*, ELECTRONIC PRIVACY INFORMATION CENTER (Jan. 15, 2025), https://epic.org/what-is-real-time-bidding/.

147.    "There are three types of platforms involved in an RTB auction: Supply Side Platforms (SSPs), Advertising Exchanges, and Demand Side Platforms (DSPs)." An SSP, like Criteo and PubMatic here, "work[s] with website or app publishers to help them participate in the RTB process."  "DSPs [like the ADNXS Tracker here[82]] primarily work with advertisers to help them evaluate the value of user impressions and optimize the bid prices they put forth."[83]   And an Advertising Exchange, like the Taboola Tracker here, "allows advertisers and publishers to use the same technological platform, services, and methods, and 'speak the same language' in order to exchange data, set prices, and ultimately serve an ad."[84]

148.    In other words, SSPs provide user information to advertisers that might be interested in those users, DSPs help advertisers select which users to advertise and target, and an Advertising Exchange is the platform on which all of this happens.

149.    The RTB process works as follows:

> After a user loads a website or app, an SSP [*e.g.*, Criteo] will send user data to Advertising Exchanges … The user data, often referred to as "bidstream data," contains information like device identifiers, IP address, zip/postal code, GPS location, browsing history, location data, and more.  After receiving the bidstream data, an Advertising Exchange [*e.g.*, Taboola] will broadcast the data to several DSPs [*e.g.*, Microsoft]. The DSPs will then examine the broadcasted data to determine whether to make a bid on behalf of their client.
>
> Ultimately, if the DSP wins the bid, its client's advertisement will appear to the user. Since most RTB auctions are held on the server/exchange side, instead of the client/browser side, the user only actually sees the winner of the auction and would not be aware of the DSPs who bid and lost.  But even the losing DSPs still benefit because they also receive and collect the user data broadcasted during the RTB auction process.  This information can be added to existing dossiers DSPs have on a user.[85]

---

[82]  MICROSOFT INVEST,  https://about.ads.microsoft.com/en/solutions/technology/microsoft-invest-dsp ("Microsoft Invest is a demand-side platform built for the future of video advertising.").

[83] Geoghegan, *supra*.

[84] *Introducing To Ad Serving*, MICROSOFT IGNITE (Mar. 3, 2024), https://learn.microsoft.com/en-us/xandr/industry-reference/introduction-to-ad-serving.

[85]  Geoghegan, *supra*; *see also* REAL-TIME BIDDING, APPSFLYER, https://www.appsflyer.com/glossary/real-time-bidding/.

**Figure 19:**



150.    Facilitating this real-time bidding process means SSPs and DSPs must have as much information as possible about Defendant's users to procure the greatest interest from advertisers and the highest bids.   These entities receive assistance because Defendant also installs the trackers of data brokers on its users' browsers:

> the economic incentives of an auction mean that DSP [or SSP] with more specific knowledge of individuals will win desirable viewers due to being able to target them more specifically and out-bid other entities.  As a consequence, the bid request is not the end of the road. The DSP enlists a final actor, the data management platform (DMP) [or a data broker].  DSPs [or SSPs] send bid requests to DMPs [and data brokers], who enrich them by attempting to identify the user in the request and use a variety of data sources, such as those uploaded by the advertiser, collected from other sources, or bought from data brokers.  The DSP with the highest bid not only wins the right to deliver the ad—through the SSP—to the individual.  The DSP also wins the right to cookie sync its own cookies with those from the [Advertising Exchange], thus enabling easier linkage of the data to the user's profile in the future.[86]

//

//

//

//

//

---

[86] Michael Veale & Federik Zuiderveen Borgesius, *Adtech and Real-Time Bidding under European Data Protection Law*, 23 GERMAN L. J. 226, 232-33 (2022) https://tinyurl.com/yjddt5ey.

**Figure 20:**



151.    In other words, an SSP like Criteo can solicit the highest bids for Website users by identifying and de-anonymizing those users by combining the information Criteo knows about that user with the information other data brokers know about that user. If there is a match, then Criteo will have significantly more information to provide about users, and that will solicit significantly higher bids from prospective advertisers (because the advertisers will have more information about the user to target their bids).

152.    Likewise, a DSP like Microsoft can generate the highest and most targeted bids from advertisers with providing those advertisers with as much information about users as possible, which it does by syncing with data brokers like Taboola—who in turn sync with even further data brokers and data sellers.

153.    All of this naturally enriches Defendant, as its users have now become more valuable and more easily targetable thanks to the replete information the Third Parties are able to provide about users.

154.    As the Federal Trade Commission ("FTC") has noted, "[t]he use of real-time bidding presents potential concerns," including but not limited to:

> (i)    "incentiviz[ing] invasive data-sharing" by "push[ing] publishers [*i.e.*, Defendant] to share as much end-user data as possible to get higher valuation for their ad inventory—particularly their location data and cookie cache, which can be used to ascertain a person's browsing history and behavior."

(ii)    "send[ing] sensitive data across geographic borders."

(iii)    sending consumer data "to potentially dozens of bidders simultaneously, despite only one of those parties—the winning bidder actually using that data to serve a targeted ad. Experts have previously cautioned that there are few (if any) technical controls ensuring those other parties do not retain that data for use in unintended ways."[87]

155.    Given Microsoft operates a DSP here, the last point is particularly relevant, as it means Microsoft—through the ADNXS Tracker—collects and discloses Website users' information to *all prospective advertisers*, even if advertisers do not ultimately show a user an advertisement. This greatly diminishes the ability of users to control their personal information.

156.    Likewise, the Electronic Privacy Information Center ("EPIC") has warned that "[c]onsumers' privacy is violated when entities disclose their information without authorization or in ways that thwart their expectations."[88]

157.    For these reasons, some have characterized "real-time bidding" as "[t]he biggest data breach ever recorded" because of the sheer number of entities that receive personal information[89]:

**Figure 21:**



---

[87] FEDERAL TRADE COMMISSION, UNPACKING REAL TIME BIDDING THROUGH FTC'S CASE ON MOBILEWALLA (Dec. 3, 2024), https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2024/12/unpacking-real-time-bidding-through-ftcs-case-mobilewalla.

[88] Geoghegan, *supra*.

[89] DR. JOHNNY RYAN, "RTB" ADTECH & GDPR, https://assortedmaterials.com/rtb-evidence/ (video).

158.    All of this is in line with protecting the right to determine who does and does not get to know one's information, a harm long recognized at common law and one the CIPA was enacted to protect against. *Ribas*, 38 Cal. 3d at 361 (noting the CIPA was drafted with a two-party consent requirement to protect "the right to control the nature and extent of the firsthand dissemination of [one's] statements"); *U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press* 489 U.S. 749, 763-64 (1989) ("[B]oth the common law and the literal understandings of privacy encompass the individual's control of information concerning his or her person."); *Deivaprakash v. Condé Nast Digital*, 798 F. Supp. 3d at 1107 (finding injury where data "collection allegedly allowed the third parties to: (1) build a profile reflecting [plaintiff's] personal information; and (2) interfere with [plaintiff's] ability to remain anonymous.").

### 3.    Cookie Syncing

159.    It should now be clear both the capabilities of the Third Parties (*i.e.*, data brokers who de-anonymize users, or companies who sync with data brokers for this purpose) and the reasons Defendant installs their Trackers on its Website (to sell to advertisers in real-time bidding with as much information about users as possible to solicit the highest bids, and to make users the most targetable by advertisers).  The final question is: how do these Third Parties share information amongst each other and with others to offer the most complete user profiles up for sale?  This occurs through "cookie syncing."

160.    Cookie syncing is a process that "allow[s] web companies to share (synchronize) cookies, and match the different IDs they assign for the same user while they browse the web."[90] This allows entities like the Third Parties to circumvent "the restriction that sites can't read each other cookies, in order to better facilitate targeting and real-time bidding."[91]

161.    Cookie syncing works as follows:

---

[90] Panagiotis Papadopoulos et al., *Cookie Synchronization: Everything You Always Wanted to Know But Were Afraid to Ask*, 1 WWW '19: THE WORLD WIDE WEB CONFERENCE 1432, 1432 (2019), https://dl.acm.org/doi/10.1145/3308558.3313542.

[91] Gunes Acar et al., *The Web Never Forgets: Persistent Tracking Mechanisms in the Wild*, 6B CCS'14: ACM SIGSAC CONFERENCE ON COMPUTER AND COMMUNICATIONS SECURITY 674, 674 (2014)

Let us assume a user browsing several domains like website1.com and website2.com, in which there are 3rd-parties like tracker.com and advertiser.com, respectively. Consequently, these two 3rd-parties have the chance to set their own cookies on the user's browser, in order to re-identify the user in the future. Hence, tracker.com knows the user with the ID user123, and advertiser.com knows the same user with the ID userABC.

Now let us assume that the user lands on a website (say website3.com), which includes some JavaScript code from tracker.com but not from advertiser.com. Thus, advertiser.com does not (and cannot) know which users visit website3.com. However, *as soon as the code of tracker.com is called, a GET request is issued by the browser to tracker.com (step 1), and it responds back with a REDIRECT request (step 2), instructing the user's browser to issue another GET request to its collaborator advertiser.com this time, using a specifically crafted URL (step 3).*

…

When advertiser.com receives the above request along with the cookie ID userABC, it finds out that userABC visited website3.com. *To make matters worse, advertiser.com also learns that the user whom tracker.com knows as user123, and the user userABC is basically one and the same user.* Effectively, CSync enabled advertiser.com to collaborate with tracker.com, in order to: (i) find out which users visit website3.com, and (ii) *synchronize (i.e., join) two different identities (cookies) of the same user on the web.*[92]

**Figure 22:**



---
[92] Papadopoulos, *supra*, at 1433.

162.    Through this process, third party trackers are not only able to resolve user identities (*e.g.*, learning that who Third Party #1 knew as "userABC" and Third Party #2 knew as "user123" are the same person), they can "track a user to a much larger number of websites," even though that "do not have any collaboration with" the third party.[93]

163.    On the flip side, "CSync may re-identify web users even after they delete their cookies."[94]  "[W]hen a user erases her browser state and restarts browsing, trackers usually place and sync a new set of userIDs, and eventually reconstruct a new browsing history."[95]  But if a tracker can "respawn" its cookie or like to another persistent identifier (like an IP address), "then through CSync, all of them can link the user's browsing histories from before and after her state erasure. Consequently: (i) users are not able to abolish their assigned userIDs even after carefully erasing their set cookies, and (ii) trackers are enabled to link user's history across state resets."[96]

164.    Thus, "syncing userIDs of a given user increases the user identifiability while browsing, thus reducing their overall anonymity on the Web."[97]

165.    Cookie syncing is precisely what is happening here.  When each of the Trackers are installed on Website users' browsers, they are syncing their cookies with other third parties on the Website (*e.g.*, Criteo, PubMatic, Yahoo).  The result of this process is not only that a single user is identified as one person by these multiple third parties, but they share all of the information about that user with one another (because the cookie is linked to a specific user profile).  This prevents users from actually being anonymous when they visit the Website, and allows users to be de-anonymized and targeted across the Internet.

*        *        *

166.    To summarize the proceeding allegations, as facilitated and enabled by Defendant, Taboola (a data broker) and Microsoft (who syncs with data brokers) focus on collecting as much

---

[93] Papadopoulos, *supra*, at 1434.

[94] *Id*.

[95] *See id*.

[96] *Id*.

[97] *Id.* at 1441.

information about Website users as possible to create comprehensive user profiles. The Third Parties record IP Addresses, Device Metadata, and unique user IDs in the first instance, but those pieces of information are used to match users to comprehensive profiles held by data brokers through "cookie syncing." Also through "cookie syncing," those profiles are shared amongst the Third Parties and with other entities to form the most fulsome picture with the most attributes as possible. And those profiles are offered up for sale to interested advertisers through real-time bidding using the Third Parties' Trackers (and again through cookie syncing), where users will command more value the more advertisers know about a user (and thus, are able to most effectively target users).

167.     Thus, the Third Parties enrich the value Defendant's users would otherwise command by tying the data they obtain directly from users on the Website (*e.g.*, IP addresses, Device Metadata, unique user IDs) with comprehensive user profiles, and enable those users to be de-anonymized and targeted with advertisements by Defendant and others across the Internet.

168.     Accordingly, Defendant is using the Trackers in conjunction with the Third Parties to (i) de-anonymize users, (ii) offer its users up for sale in real-time bidding, and target those users with advertisements on other websites, and (iii) monetize its Website users by installing the Trackers and allowing the Third Parties to collect as much information about Website users as possible (without consent).

169.     Thus, Defendant is unjustly enriched through their installation and use of the Trackers, which causes data to be collected by Third Parties without Plaintiff's and Class Members' consent, and that enable the Third Parties to sell Defendant's user inventory in an ad-buying system. In addition, Plaintiff and Class Members lost the ability to control their information, as their information ends up in the hands of data brokers, advertising inventory sellers, and a virtually unlimited number advertisers themselves without knowledge or consent.

170.     Further, because Defendant installs the Trackers on Plaintiff's and Class Members' browsers, the Third Parties continue to track Plaintiff and Class Members wherever they go online, thus building even more comprehensive user profiles over time that are provided to the Third Parties' other clients (or further enrich Defendant here).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**B.      Defendant Uses The ADNXS Tracker For Targeted Advertising, Identity Resolution, And Data Monetization**

171.    Microsoft describes its advertising services, which include the ADNXS or Microsoft Invest Tracker, as "a strategic buying platform built for the needs of today's advertisers looking to invest in upper-funnel buying and drive business results."[98]

172.    The ADNXS Tracker is a DSP as noted above.  However, the comprehensiveness of the ADNXS Tracker enables it to "serve[] as the hub, a single integration point, where data providers can offer their data in real time" and "where [] technologies can be integrated with the many moving pieces of real-time ad sales to enhance ad targeting, which will benefit both buyers and sellers."[99] The UIDS is evidence of this, where Microsoft compiles and syncs with a number of profiles held by data brokers and data sellers and retains that information as one single identifier (the UIDS), rather than dozens of disparate identifiers.

173.    Microsoft collects data to help companies with their marketing; when the processing system "receives ad requests, [it] applies data to the request, receives bids, makes decisions, serves creatives, logs, auctions, etc."[100]

174.    In particular:

> The Microsoft Advertising platform is a real-time bidding system and ad server.  The main processing system is called the "impression bus." The impression bus receives ad requests, applies data to the request, receives bids, makes decisions, serves creatives, logs auctions, etc.
>
> Ad calls come in via our inventory supply partners: exchanges, SSPs, ad networks, and a few valued publishers.
>
> …
>
> Once we get the call, we overlay segment data from our server-side cookie store.  Data is added to the cookie store either through Xandr segment pixels or by clients sending us a file of data.  We also contact third-party data providers and overlay any available data.

---

[98] *About Microsoft Invest*, MICROSOFT IGNITE (Feb. 12, 2024), https://learn.microsoft.com/en-us/xandr/invest/about-invest (last visited Dec. 25, 2025).

[99] BIDDERS – USER ID MAPPING, https://learn.microsoft.com/en-us/xandr/bidders/user-id-mapping.

[100] *About Microsoft Invest*, MICROSOFT IGNITE (Feb. 12, 2024), https://learn.microsoft.com/en-us/xandr/invest/about-invest (last visited Dec. 25, 2025).

1
2
3

> We contact all of the bidders on our platform.  The ad call includes
> whatever user data belongs to each bidder, and information about the
> inventory.  Bidders have a certain number of milliseconds in which to
> respond with a bid and the creative they want to serve.
>
> …
>
> The impression bus decides which bid wins based on the amount of
> the bid, and any preferences the publisher has about what they want
> served on their page.  If the call was client-side, Microsoft Advertising
> serves the ad.  If it was server-side, Microsoft Advertising passes the
> bid and the location of the creative to the partner who will ultimately
> serve the ad. [101]

4
5
6
7
8

175.    Microsoft Invest (*i.e.*, the ADNXS Tracker) provides "targeting, bidding algorithms, multi-currency support, and all the other features of a premium ad server."[102]  To do this, Microsoft utilizes data from its cookie store.  The "[d]ata is added to the cookie store either through Microsoft Advertising segment pixels or by clients sending [them] a file of data.  [They] also contact third-party data providers and overlay any available data."[103]

176.    As alleged above, Microsoft also integrates with the data brokers whose trackers Defendant installs on the Website.  This provides Microsoft to de-anonymize and identify Website users, which it provides to advertisers so those advertisers can best target their advertisements.  And, because Defendant's users have now been de-anonymized and identified, Defendant derives additional revenue from this process because advertisers will pay more to show advertisements to Defendant's users.  Likewise, Defendant can effectively target users across the Internet.

177.    In other words, when users visit Defendant's Website, Microsoft collects users' IP addresses, Device Metadata, and unique identifiers through its ADNXS Tracker to provide to advertisers interested in showing an advertisement to Defendant's Website users, enriching that information by syncing with the trackers of data brokers (and its own data), and ultimately enabling Defendant to monetize its Website users and maximize revenue by enabling Microsoft to collect as much information about Defendant's users as possible.

---

[101] *Id.*

[102] *Id.*

[103] *Id.*

**C.**   **Defendant Uses the Taboola Tracker For Targeted Advertising Identity Resolution, And Data Monetization**

178.   As noted above, Taboola is a registered data broker in the state of California.  Taboola "gathers [first party] data to help [its customers like Defendant] understand the actions users take on [their] website, like page visits, account creation, purchases, and video views."[104]

179.   Customers like Defendant install and use the Taboola Tracker and then define "conversions" they want to track.[105]  There are two types of conversions: (1) URL-based: Tracks every time someone visits specific web pages as a conversion; and (2) Event-based: Tracks every time someone completes a specific action as a conversion.  For example, users who submitted their email on your site or subscribed to a newsletter."[106]

180.   Taboola then takes this first party data and uses it to match a company's audience against Taboola's comprehensive user profiles, which are based on "17 years of data."[107]

**Figure 23:**



Powerful Performance AI

Taboola's AI uses 17 years of data to deliver targeted, scalable ads that drive ROI and growth.

181.   That is, Taboola "combines this [first party] data with our algorithm to automatically analyze how people find and interact with your website.  The Taboola Pixel helps [customers like

---

[104]   *Taboola Pixel Overview*, TABOOLA, INC., https://help.taboola.com/hc/en-us/articles/360003469854-Taboola-Pixel-Overview.

[105]   *Defining and Creating Conversions*, TABOOLA, INC., https://help.taboola.com/hc/en-us/articles/360003484314-Defining-and-Creating-Conversions.

[106]   *Id.*

[107]   TABOOLA REALIZE, https://discover.taboola.com/realize-us/.

Defendant] optimize [their] marketing campaigns for maximum success."[108]  Taboola's proprietary algorithm analyzes the first party data from say Defendant against other user profiles to identify potential matches across different devices and platforms.  Customers like Defendant can also "[u]se Taboola's data visualizations and reporting to get a more comprehensive overview" of users and "where your best activity comes from."[109]

182.    Taboola then takes its customers' first-party data and combines it with the profile data it already has, making that information more valuable to advertisers, thereby driving Defendant's revenue and advertising reach.  Taboola offers such advertisers "1P Taboola Audiences [which] refer[s] to audience segments built from Taboola first-party data – either via exclusive partnerships or contextual signals from our publisher network" and "combine[s]" it with Taboola's comprehensive user profiles obtained from other third parties (*i.e.*, data Taboola collects on its own) "to increase [an advertiser's] reach."[110]

183.    Taboola's identity resolution tool, "Audience Targeting," allows advertisers to reach their target audiences and segments across various platforms and devices, creating a unified profile to deliver more relevant targeted advertising based on a user's combined online activity.  Taboola does this by gathering a company's first-party data via its Taboola Pixel, and "combin[ing] this data with our algorithm"[111] and matching it to Taboola's database "with over 600 million unique daily active users."[112]

184.    Taboola's reach is "massive": "You have probably seen our ads natively integrated into sites like Yahoo, NBC News, MSN, The Independent and The Weather Channel.  With massive

---

[108]   *Taboola Pixel Overview*, TABOOLA, INC., https://help.taboola.com/hc/en-us/articles/360003469854-Taboola-Pixel-Overview.

[109]   *Taboola Pixel Overview*, TABOOLA, INC., https://help.taboola.com/hc/en-us/articles/360003469854-Taboola-Pixel-Overview.

[110]   *Targeting Marketplace Audiences*, TABOOLA, INC., https://help.taboola.com/hc/en-us/articles/115001936293-Targeting-Marketplace-Audiences

[111]   *Taboola Pixel Overview*, TABOOLA, https://help.taboola.com/hc/en-us/articles/360003469854-Taboola-Pixel-Overview

[112]   *How Taboola Works*, TABOOLA, https://help.taboola.com/hc/en-us/articles/115006597307-How-Taboola-Works.

scale, unique readership data and world-class AI technology, we help tens of thousands of advertisers reach and convert their audiences with compelling native ads in a brand-safe environment."[113] Taboola's "algorithm analyzes your content" and "predicts good matches across Taboola's publisher network and begins recommending your content while gathering results."[114]

185. "Taboola's 'SmartBid' feature takes the guesswork out of manual bid adjustments in order to ensure that advertisers are getting their most effective placements at the lowest cost. SmartBid leverages data from billions of conversions to bid intelligently at the right moments across Taboola's ever evolving network, bidding competitively on higher-converting publishers and lower on lower-converting publishers, and making sure you're not missing out on key conversion opportunities."[115] And advertisers "can target your [Taboola] campaign based by location, time, browser type, connection type, audience segments, and more. Your campaign targeting options will impact where your content will be shown."[116]

186. In short, by installing Taboola's Tracker on Website users' browsers, Defendant and Taboola can de-anonymize users by correlating their IP addresses, Device Metadata, and unique identifiers to profiles maintained by Taboola and other data brokers, and sell those profiles to advertisers to enrich Defendant (or allow Defendant itself to target those users with advertisements on other websites). Taboola also benefits from this arrangement, as it collects additional information about users it can use in the future on behalf of other clients, and can continue to track now de-anonymized users across the Internet.

## IV.   PLAINTIFF'S EXPERIENCE

187. Plaintiff regularly visited the Website on his desktop browser—as long ago as November 2024 and as recently as March 2025—and has done so throughout the entirety of the class period.

---

[113] *Id.*

[114] *Id.*

[115] *Id.*

[116] *Id.*

188.    When Plaintiff visited the Website, the Website's code—as programmed by Defendant—caused the Trackers to be installed on Plaintiff's browser.  *See* Figures 4, 15, *supra*. Defendant also caused various data brokers' and data sellers' trackers to be installed on Plaintiff's browser.  *See, e.g.*, Figures 7, 9, 14, 16-17, *supra*.

189.    Through their respective Trackers, the Third Parties collected and recorded Plaintiff's IP address, Device Metadata, and set a cookie with a unique user ID that allowed the Third Parties to pervasively track Plaintiff across multiple Website sessions and even other websites, as well as de-anonymize Plaintiff by synchronizing his user with other entities.  *See* Figures 7-12, 14, 16-17, 23, *supra*.

190.    Defendant and the Third Parties used the information (IP addresses, Device Metadata, unique user identifiers) recorded and decoded by the Trackers to:

    (i)    identity Plaintiff and either create a new profile of him in the Third Parties' databases or match Plaintiff to a pre-existing profile (either in the Third Parties' own databases or with another entity's profile);

    (ii)    sell Plaintiff's information to advertisers for hyper-targeted advertising based on the information collected by the Third Parties on the Website—including but not limited to Plaintiff's location information based on his IP address—and the information contained on any profiles of Plaintiff (which are linked to Plaintiff via the information collected by the Third Parties on the Website);

    (iii)    actually target Plaintiff with advertisements and serve advertisements on Plaintiff based on the information collected by the Third Parties—including but not limited to Plaintiff's location information based on his IP address—on the Website and the information contained on any profiles of Plaintiff (which are linked to Plaintiff via the information collected by the Third Parties on the Website); and

    (iv)    de-anonymize Plaintiff and generate revenue from the sale of Plaintiff's information—both what is collected on the Website by the Third Parties and the profiles this information is linked to—to advertisers, thus boosting Defendant's, advertisers', and the Third Parties' revenue and the value of the Third Parties' services.

191.    Plaintiff did not provide his prior consent to Defendant to install or use the Trackers on his browser.  Nor did Defendant obtain a court order before installing or using the Trackers.

192.    Thus, Plaintiff has had his privacy invaded by Defendant's violations of CIPA § 638.51(a), and Defendant has likewise been unjustly enriched through the Third Parties' surreptitious and unconsented-to collection of Plaintiff's data.   Accordingly, Plaintiff has been injured by Defendant's violation of the CIPA.

## V.    DEFENDANT IS SUBJECT TO JURISDICTION IN CALIFORNIA

193.    Defendant purposefully directed its conduct at California residents.   Defendant took the intentional act of installing the Trackers (pen registers) on its users' browsers.   This is so because Defendant programmed the code of its Website to install the Trackers, Defendant entered agreements with each of the Third Parties operating the Trackers for the provision of said Trackers, and Defendant used and profited off of the information surreptitiously and unlawfully collected by the Third Parties operating the Trackers.

194.    Defendant expressly aimed its conduct at California.   Defendant's Website relies mostly if not entirely on advertising revenue to provide its content.   As noted above, Defendant generates revenue by selling or sharing Website users' data with advertisers on other websites vis-à-vis the Third Party Trackers, and advertisers pay Defendant money through the Third Party Trackers to show specific Website users specific advertisements based on that data.   Defendant will likewise bid to show Website users advertisements on other websites, which it effectively can do as a result of installing and using the Third Party Trackers.

195.    When a user accesses the Website, Defendant knows the location of that user because Defendant also receives the user's IP address, and a user's IP address correlates to their approximate location.   Thus, if a California user accesses the Website, Defendant knows the user is accessing the Website from California, knows it is installing the Trackers on a California user's browser, knows that the data of California users is being shared with and sold to advertisers, and knows that it is profiting off the data of California users.

196.    Crucially, Defendant knows a user is accessing its Website from California *before* Defendant installs the Third Party Trackers on the user's browser.   Recall the technological order of operations.   *See* Figure 1, *supra*.   *First*, the user's browser communicates with Defendant's Website.

Through this transmission, Defendant learns the user's IP address, and therefore, the user's location. *Then*, Defendant's Website—as programmed by Defendant—responds with code or instructions to install the Trackers on the user's browser. Thus, when Defendant installs the Trackers on the user's browser, Defendant knows the location that the user is accessing the Website from.

197. Plaintiff was among the California residents whose information was sold to advertisers, as caused by Defendant's knowing and intentional installation of the Trackers on Plaintiff's browser. For example, as noted above, Defendant knew Plaintiff was in California when Defendant installed the Trackers on Plaintiff browser based on Plaintiff's IP address, and the Third Parties also collected Plaintiff's IP address through their respective Trackers, thus revealing Plaintiff's location to the Third Parties.

198. In sum, Defendant expressly aimed its conduct at California for at least the following reasons: (i) Defendant knew where Plaintiff's and other Class Members' browsers were accessing the Website from (California) "when it installed [the Trackers] on [Plaintiff's and Class Members'] device[s]"; and (ii) Defendant knowingly profited from the disclosure and sale of Californians' information through its installation and use of the Trackers. *See Briskin v. Shopify, Inc.*, 135 F.4th. 739, 746 (9th Cir. 2025).

## CLASS ALLEGATIONS

199. Pursuant to Fed. R. Civ. P. Rule 23(a) and 23(b)(3), Plaintiff seeks to represent a class defined as all California residents who accessed the Website in California and had their IP address, Device Metadata, and/or user identifiers collected by the Trackers (the "Class").

200. The following people are excluded from the Class: (i) any Judge presiding over this action and members of his or her family; (ii) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which Defendant or their parents have a controlling interest (including current and former employees, officers, or directors); (iii) persons who properly execute and file a timely request for exclusion from the Class; (iv) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (v) Plaintiff's counsel and

Defendant's counsel; and (vi) the legal representatives, successors, and assigns of any such excluded persons.

201.    **Numerosity:** The number of people within the Class is substantial and believed to amount to thousands, if not millions of persons.  It is, therefore, impractical to join each member of the Class as a named plaintiff.  Further, the size and relatively modest value of the claims of the individual members of the Class renders joinder impractical.  Accordingly, utilization of the class action mechanism is the most economically feasible means of determining and adjudicating the merits of this litigation.  Moreover, the Class is ascertainable and identifiable from Defendant's records or those of the Third Parties.

202.    **Commonality and Predominance:** There are well-defined common questions of fact and law that exist as to all members of the Class and that predominate over any questions affecting only individual members of the Class.  These common legal and factual questions, which do not vary between members of the Class, and which may be determined without reference to the individual circumstances of any Class Member, include, but are not limited to, the following:

    (i)    Whether Defendant violated CIPA § 638.51(a);

    (ii)    Whether the Trackers are "pen registers" pursuant to Cal. Pen. Code § 638.50(b);

    (iii)    Whether Defendant sought or obtained prior consent—express or otherwise—from Plaintiff and the Class;

    (iv)    Whether Defendant sought or obtained a court order for its use of the Trackers; and

    (v)    Whether Plaintiff and members of the Class are entitled to actual and/or statutory damages for the aforementioned violations.

203.    **Typicality:** The claims of the named Plaintiff are typical of the claims of the Class because the named Plaintiff, like all other members of the Class Members, visited the Website and had his IP address collected by the Trackers, which were installed and used by Defendant.

204.    **Adequate Representation:** Plaintiff is an adequate representative of the Class because his interests do not conflict with the interests of the Class Members he seeks to represent, he has retained competent counsel experienced in prosecuting class actions, and he intends to

prosecute this action vigorously.  The interests of members of the Class will be fairly and adequately protected by Plaintiff and his counsel.

205.    **Superiority:** The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of members of the Class.  Each individual member of the Class may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability.  Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case.  Individualized litigation also presents a potential for inconsistent or contradictory judgments.  In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability.  Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

## CAUSES OF ACTION
### COUNT I
**Violation Of The California Invasion Of Privacy Act,
Cal. Penal Code § 638.51(a)**

206.    Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein.

207.    Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendant.

208.    CIPA § 638.51(a) proscribes any "person" from "install[ing] or us[ing] a pen register or a trap and trace device without first obtaining a court order."

209.    A "pen register" is a "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." Cal. Penal Code § 638.50(b).

210.    The Trackers are "pen registers" because they are "device[s] or process[es]" that "capture[d]" the "routing, addressing, or signaling information"—the IP address, Device Metadata, and unique user IDs—from the electronic communications transmitted by Plaintiff's and the Class's computers or smartphones (*i.e.*, "instruments").  Cal. Penal Code § 638.50(b).

211.    Likewise, the Trackers are "pen registers" because they are "device[s] or process[es]" that record information that is being used to ascertain the identity of visitors to Defendant's Website," and are thus capturing "addressing" information.  *Greenley*, 684 F. Supp. 3d at 1050 ("software that identifies consumers" is a pen register).

212.    At all relevant times, Defendant installed the Trackers—which are pen registers—on Plaintiff's and Class Members' browsers, which allowed the Third Parties to collect Plaintiff's and Class Members' IP addresses and Device Metadata.  The Trackers also set a unique user identifier on Plaintiff's and Class Members' browsers so the Third Parties could track Plaintiff and Class Members across multiple Website sessions and multiple websites.

213.    Defendant and the Third Parties used the information (IP addresses, Device Metadata, unique user identifiers) recorded and decoded by the Trackers to:

(i)    identity Plaintiff and Class Members and either create new profiles of them in the Third Parties' databases or match Plaintiff and Class Members to pre-existing profiles (either in the Third Parties' own databases or with another entity's profile);

(ii)    sell Plaintiff's and Class Members' information to advertisers for hyper-targeted advertising based on the information collected by the Third Parties on the Website—including but not limited to Plaintiff's and Class Members' location information based on their IP addresses—and the information contained on any profiles of Plaintiff and Class Members (which are linked to Plaintiff and Class Members via the information collected by the Third Parties on the Website);

(iii)    actually target Plaintiff and Class Members with advertisements and serve advertisements on Plaintiff and Class Members based on the information collected by the Third Parties on the Website—including but not limited to Plaintiff's and Class Members' location information based on their IP addresses—and the information contained on any profiles of Plaintiff and Class Members (which are linked to

Plaintiff and Class Members via the information collected by the Third Parties on the Website); and

(iv)    de-anonymize Plaintiff and Class Members and generate revenue from the sale of Plaintiff's and Class Members' information—both what is collected on the Website by the Third Parties and the profiles this information is linked to—to advertisers, thus boosting Defendant's, advertisers', and the Third Parties' revenue and the value of the Third Parties' services.

214.    When Defendant installed and used the Trackers on Plaintiff's and Class Members' browsers—and when the Third Parties collected Plaintiff's and Class Members' information—Defendant knew that Plaintiff and Class Members were in California based on their IP addresses. Thus, Defendant harmed Plaintiff and Class Members knowing they were in California and unlawfully profited off Plaintiff's and Class Members' information knowing that information came from Californians.

215.    The Trackers do not collect the content of Plaintiff's and the Class's electronic communications with the Website. *In re Zynga Privacy Litig.*, 750 F.3d 1098, 1108 (9th Cir. 2014) ("IP addresses constitute addressing information and do not necessarily reveal any more about the underlying contents of communication…") (cleaned up).

216.    Plaintiff and Class Members did not provide their prior consent to Defendant's installation or use of the Trackers.  Nor did Defendant obtain a court order to install or use the Trackers.

217.    Pursuant to Cal. Penal Code § 637.2(a), Plaintiff and Class Members have been injured by Defendant's violations of CIPA § 638.51(a), and each seeks statutory damages of $5,000 for each of Defendant's violations of CIPA § 638.51(a).

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendant, as follows:

(i)    For an order certifying the Class, naming Plaintiff as the representative of the Class, and naming Plaintiff's attorneys as Class Counsel to represent the Class;

(ii)    For an order declaring that Defendant's conduct violates the CIPA;

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

(iii)    For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

(iv)    For statutory damages of $5,000 for each violation of CIPA § 638.51(a);

(v)    For pre- and post-judgment interest on all amounts awarded; and

(vi)    For an order awarding and the Class their reasonable attorney's fees, expenses, and costs of suit.

## JURY DEMAND

Pursuant to Fed. R. Civ. 38(b), Plaintiff demands a trial by jury on all causes of action and issues so triable.

Dated: December 25, 2025

Respectfully submitted,

**BURSOR & FISHER, P.A.**

By: */s/ Max S. Roberts*
    Max S. Roberts

Max S. Roberts (State Bar No. 363482)
Victoria X. Zhou (*Pro Hac Vice*)
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (646) 837-7150
Facsimile:  (212) 989-9163
E-mail: mroberts@bursor.com
       vzhou@bursor.com

**BURSOR & FISHER, P.A.**
Kaili C. Lynn (State Bar No. 334933)
Joshua R. Wilner (State Bar No. 353949)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-mail: klynn@bursor.com
       jwilner@bursor.com

**BURSOR & FISHER, P.A.**
Philip L. Fraietta (State Bar No. 354768)
50 Main St., Ste. 475
White Plains, NY 10606
Telephone: (914) 874-0710
Facsimile: (914) 206-3656
E-mail: pfraietta@bursor.com

*Attorneys for Plaintiff*